**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | CHAPTER 11 |
| | § | |
| **BASIC ENERGY SERVICES, INC.**, *et al.*, | § | Case No. 21-90002 (DRJ) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| _____ | § | |
| **PPC ENERGY, LP and PRIEST** | § | |
| **PETROLEUM CORPORATION,** | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Adversary No. 23-03208 |
| | § | |
| vs. | § | |
| | § | |
| **SELECT ENERGY SERVICES, LLC,** | § | |
| | § | |
| Defendant. | § | |

**PPC ENERGY, LP AND PRIEST PETROLEUM CORPORATION'S STATEMENT OF**
**NON-CONSENT AND MOTION TO REMAND**

---

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Basic Energy Services, L.P. (1819); Basic Energy Services, Inc. (1194); C&J Well Services, Inc. (5684); KVS Transportation, Inc. (4882); Indigo Injection #3, LLC (7657); Basic Energy Services GP, LLC (1197); Basic Energy Services LP, LLC (1195); Taylor Industries, LLC (7037); SCH Disposal, L.L.C. (8335); Agua Libre Holdco LLC (3092); Agua Libre Asset Co LLC (1409); Agua Libre Midstream LLC (6701); and Basic ESA, Inc. (2279). The Debtors' headquarters and service address for the purposes of these chapter 11 cases is 801 Cherry Street, Suite 2100, Fort Worth, Texas 76102.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs PPC Energy, LP and Priest Petroleum Corporation (collectively, "Plaintiffs"), hereby file *Plaintiffs' Statement of Non-Consent and Motion to Remand* and as such, respectfully show the Court the following:

## I.
### RULE 9027(E) STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 9027(e), Plaintiffs PPC Energy, LP and Priest Petroleum Corporation do not consent to entry of final order or judgment by the Bankruptcy Court. Further, Plaintiffs do not consent to a jury trial before the Bankruptcy Court. Plaintiffs respectfully request an order remanding this case to the 157th District Court of Harris County, Texas.

## II.
### INTRODUCTION

Select Energy Services, LLC ("Select") removed this case from the 157th Judicial District of Harris County, Texas (Case No. 202355513).

Federal jurisdiction over Plaintiffs' claims against Select does not exist because Plaintiffs' claims do not arise out of or relate to the bankruptcy proceeding of Basic Energy Services, Inc. and its affiliates (collectively, "Basic"). Rather, Plaintiffs' claims: (a) concern a dispute between two non-debtors; (b) were filed after Basic's plan was confirmed; (c) do not involve any property of Basic's former bankruptcy estate; and (d) do not involve or otherwise impact Basic's approved liquidation plan. Accordingly, this dispute is not "related to" the Basic bankruptcy.

Further, despite Select's arguments to the contrary, a forum selection provision in a contract cannot "create" federal question jurisdiction.

Plaintiffs seek remand.

## III.
### RELEVANT FACTS

**A.     Plaintiffs bring suit against Basic.**

1.      In January 2020, Plaintiffs brought suit against Basic, alleging that Basic's saltwater injection operations permanently ruined Plaintiffs' oil and gas reserves in Reeves County, Texas in violation of the Texas Natural Resources Code.  [Dkt. 1-1. ¶¶ 18-19].

**B.     Basic files for bankruptcy.**

2.      On August 17, 2021, while litigation was ongoing, Basic commenced a voluntary case under chapter 11 of title 11 of the United States Code in the U.S. Bankruptcy Court for the Southern District of Texas.  [*In re Basic Energy Services, Inc.*, *et al.*, Case No. 21-90002 (the "Basic Bankruptcy") (Dkt. 1)].

**C.     Select agrees to accept environmental liabilities in exchange for Basic assets.**

3.      On August 25, 2021, this Court approved an *Emergency Motion of Debtors Approving (A) Bidding Procedures, (B) Stalking Horse Bid Protections, etc.* (the "Stalking Horse Procedures") to govern the auction and sale of certain Basic assets.  [Basic Bankruptcy, Dkt. 179].

4.      Per the Stalking Horse Procedures, Select agreed to act as a stalking horse for Basic's water logistics assets, including the injection well that caused permanent damage to Plaintiffs' wells.  [*See id.*].  Thereafter, Basic's water logistics business was subjected to competitive bidding per the terms of the Stalking Horse Procedures.  [*See id.*].

5.      On September 16, 2021, Basic notified this Court that Select was successful in submitting the highest bid for the water logistics business.  [Basic Bankruptcy, Dkt. 366].

6.      Pursuant to the bidding procedures, the winning bid submitted by Select included an offer to "purchase the Assets in exchange for (i) $15 million in cash and Stock Consideration . . . and (ii) the assumption of all Assumed Liabilities . . . ."  [*Id.*].

**D.      The Court grants relief from automatic stay and approves Basic's plan.**

7.      On October, 15, 2021, this Court granted limited relief from the automatic stay such that Plaintiffs' claims against Basic could proceed to trial in Reeves County, Texas.  [Basic Bankruptcy, Dkt. 497].

8.      On August 9, 2022, the Court entered an *Order Confirming the Debtor's Combined Plan Liquidation and Approving on a Final Basis the Disclosure Statement of Basic Energy Services, Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code*.  [Basic Bankruptcy, Dkt. 1436].

**E.      Plaintiffs establish Basic liability.**

9.      On August 29, 2022, Plaintiffs' claims were tried in the 143rd Judicial District in Reeves County, Texas and the jury rendered a favorable verdict for Plaintiffs on Plaintiffs' claims. [Dkt. 5-1, pp. 144-54].  On May 12, 2023, the Honorable Judge Mike Swanson signed a *Final Judgment* awarding Plaintiffs relief.  [*Id.*].

**F.      Plaintiffs bring suit against Select, and Select wrongfully removes Plaintiffs' claims.**

10.     On August 22, 2023, Plaintiffs filed suit against Select in state court in Harris County, Texas, seeking recovery for two sets of claims.  [Dkt. 1-1, Exhibit A-2].  First, Plaintiffs allege the relief awarded in the *Final Judgment* is an "Assumed Liability" per the terms of the applicable asset purchase agreement.  [*Id.* at ¶¶ 34-44].  Second, Plaintiffs allege that **after** the sale to Select, Select continued saltwater injections, which caused Plaintiffs to lose control of their wells, substantially increasing the cost to plug and abandon the wells.  [*Id.* ¶¶ 45-51].

11.     On September 18, 2023, Select removed the Harris County lawsuit from state court, alleging federal bankruptcy court jurisdiction exists "because [the Removed Action] arises in, or alternatively, is related to the" Basic Bankruptcy.  [Dkt. 1, ¶ 9].

## IV.
### ARGUMENT

To support removal, Select bears the burden of establishing federal jurisdiction over the state-court suit. *See Carpenter v. Wichita Falls Indep. School Dist.*, 44 F.3d 362, 365 (5th Cir. 1995). Because the effect of removal is to deprive the state court of an action properly before it, removal "raises significant federalism concerns," which "mandate strict construction of the removal statute." *Id.*; *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 809 (1986); *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107 (1941).

A determination that a cause of action presents a federal question depends upon the allegations in Plaintiffs' complaint. *See Carpenter*, 44 F.3d at 366. Generally, under the removal statute, a suit arises under federal law if there appears on the face of the complaint some substantial, disputed question of federal law. *Id.* (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 12 (1983)). "Accordingly, to support removal, the defendant must locate the basis of federal jurisdiction in those allegations necessary to support the plaintiff's claim, ignoring his own pleading and petition for removal." *See Carpenter*, 44 F.3d at 366. A defendant "may not remove on the basis of an anticipated or even inevitable federal defense, but instead must show that a federal right is an element, and an essential one, of the plaintiff's cause of action." *Id.* (internal citations omitted).

**A.     Plaintiffs' claims do not arise out of or relate to the Basic Bankruptcy.**

Post-confirmation disputes "typically do not give rise to bankruptcy court jurisdiction." *In re Reliant Expl. Ltd.*, 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005) (citing *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388 (5th Cir. 2001)). Bankruptcy courts are courts of limited jurisdiction, and derive their jurisdiction solely from statute. *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). Pursuant to 28 U.S.C. §§ 1334, 157, bankruptcy courts are granted jurisdiction over matters that

"arise under," "arise in," or "relate to" cases under Title 11. "Unless a case falls into one of these categories, a bankruptcy court cannot exercise jurisdiction." *In re Reliant Expl. Ltd.*, 336 B.R. at 289.

"'Arises under' jurisdiction only confers jurisdiction to a bankruptcy court over issues that are specifically presented to it through a formal bankruptcy petition." *Id.* (citing *In re Canion*, 196 F.3d 579, 584 (5th Cir. 1999)). Here, Plaintiffs' claims are not specifically presented to the Court through a formal bankruptcy petition.

To determine whether a case "arises in" or is "related to" Title 11, the U.S. Court of Appeals for the Fifth Circuit has ruled that it is only necessary to determine whether a matter is at least "related to" the bankruptcy. *In re Bass*, 171 F.3d at 1022; *In re Canion*, 196 F.3d at 584–85; *Matter of Wood*, 825 F.2d 90, 93 (5th Cir. 1987). "'Related to' is a term of art and means that this Court must determine whether the outcome of this proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Reliant Expl. Ltd.*, 336 B.R. at 289.

### (1)    *Plaintiffs' claims will not impact property of the estate.*

In order for bankruptcy court jurisdiction to attach under the "related to" test, the outcome of an action must ***both***: (1) alter the rights, obligations, and choices of action of the debtor; and (2) have an effect on the administration of the bankruptcy estate. *Id.* (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)). Here, neither requirement is met.

***First***, Plaintiffs claims can have no effect on the rights, obligations, and choices of action of the debtor—Basic—irrespective of how Plaintiffs' claims are disposed of on the merits. If, on the one hand, Plaintiffs are correct in alleging the *Final Judgment* is an "assumed liability" per the terms of the asset purchase agreement, Select (not Basic) has contractual responsibility to pay the liability. If, on the other hand, Plaintiffs are incorrect in alleging the Final Judgment is an

"assumed liability" per the terms of the asset purchase agreement, Plaintiffs have already stipulated that they will not seek recovery of the *Final Judgment* directly from property of Basic or Basic's estate.  [Basic Bankruptcy, Dkt. 497 ("The Debtors and their estates and the reorganized debtors and their estates shall not be obligated to pay any amounts owed or awarded in connection with the Lawsuit, including, but not limited to, any monetary damages, insurance deductible, self-insured retention, or attorneys' fees and expenses.")].  Therefore, Plaintiffs' claims cannot affect Basic or property of the estate irrespective of whether they succeed or fail.

**Second**, Plaintiffs' claims cannot have any effect on the bankruptcy estate insofar as the bankruptcy estate no longer exists.  On August 9, 2022, this Court confirmed Basic's plan.  [Basic Bankruptcy, Dkt. 1436].  Once a debtor's plan is confirmed, the debtor's estate ceases to exist:

> After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.  *In re Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993).  No longer is expansive bankruptcy court jurisdiction required to facilitate "administration" of the debtor's estate, for there is no estate left to reorganize.

*In re Craig's Stores of Tex., Inc.*, 266 F.3d at 390.  Because the "estate" does not exist post-confirmation, Plaintiffs' claims cannot have any effect on Basic's "estate."  *See id.*; *see also In re TransAmerican Nat. Gas Corp.*, 127 B.R. 800, 803–04 (S.D. Tex. 1991) (deciding bankruptcy estate ceased to exist upon confirmation of plan).

In 2005, the U.S. Bankruptcy Court for the Southern District of Texas found it did not have jurisdiction to adjudicate a lawsuit related to an alleged breach of a contract negotiated and executed by the creditors' trust and "approved by this Court in connection with the confirmation of the Debtor's plan."  *In re Reliant Expl. Ltd.*, 336 B.R. at 288.  In finding that no jurisdiction to adjudicate the dispute existed, the Court noted:

If the Court were to adopt the Trustee's contention that jurisdiction exists over this contractual dispute, the bankruptcy would continue for years to come, even though the Plan has been confirmed. Each time a dispute occurred as to the manner in which the ORRI is to operate, this Court would be charged with resolving the dispute under the Trustee's all-encompassing view of the Court's jurisdiction. This would result in perpetual jurisdiction by this Court over matters outside the scope of its authority. No basis exists for this Court to resolve this post-confirmation, non-bankruptcy dispute and it should be dismissed.

Finally, this Court's retained jurisdiction following confirmation of a reorganization plan is not limitless. Bankruptcy Rule 3020(d) addresses the extent of the bankruptcy court's retained power following plan confirmation. The Rule states that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Bank.Rule 2030(d). The Court's retained jurisdiction is limited to concluding "matters pending before it prior to confirmation and to continue to administer the estate as necessary, e.g., resolving objections to claims." Advisory Committee Notes to Bank.Rule 2030(d).

*Id.* at 290–91.

### (2)   *Plaintiffs' claims will not impact Basic's approved plan.*

"Following the confirmation of a Chapter 11 reorganization plan, bankruptcy jurisdiction is limited to matters pertaining to the implementation or execution of the plan." *Matter of Chesapeake Energy Corp.*, 70 F.4th 273, 281 (5th Cir. 2023) (internal quotations omitted). The Fifth Circuit has repeatedly emphasized that the "overarching question" with respect to jurisdiction over post-confirmation claims is: "Does the dispute pertain to the implementation or execution of the debtor's reorganization plan?" *In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 534 (5th Cir. 2022); *In re Sanchez Energy Corp.*, 648 B.R. 592, 604 (Bankr. S.D. Tex. 2023). Here, the answer is "no."

Basic's approved plan calls for liquidation. [Basic Bankruptcy, Dkt. 1436]. Therefore, this matter is unlike cases in which post-confirmation claims threatened to "disrupt the careful

balance struck" between the debtor and creditors in a negotiated and confirmed reorganization plan. *See In re GenOn*, 42 F.4th at 532–33; *see also In re Sanchez*, 648 B.R. at 604. Likewise, Plaintiffs claims against Select do not concern the resolution of post-confirmation issues related to the plan (*i.e.*, "amounts owed on proofs of claim, administrative claims, preference and fraudulent transfer claims, and attorneys' fees" or the interpretation of "the terms of a confirmed reorganization plan"). *See Chesapeake*, 70 F.4th at 281. And, again, Plaintiffs claims can have no effect on Basic's plan because if Plaintiffs are correct in that Select assumed liabilities to Plaintiffs there is no liability on behalf of Basic. Conversely, Plaintiffs have already disclaimed the ability to collect directly from Basic to the extent their claims against Select fail. [Basic Bankruptcy, Dkt. 497].

Furthermore, all of the *Craig's Stores* factors, which are a "useful heuristic for determining whether a matter concerns the effectuation of the plan" cut against a finding of jurisdiction. *See Craig's Stores*, 266 F.3d at 391.

*First*, the claims at issue principally deal with post-confirmation relations between the parties (*i.e.*, whether Select has liability to pay the post-confirmation final judgment rendered against Basic in favor of Plaintiffs). *See id.* Indeed, as Select notes in its *Motion to Dismiss*, the liability of Select did not accrue until "due" from Basic. [Dkt. 5, p. 4]. Basic's liability was not due until entry of the May 12, 2023 *Final Judgment* ordering Basic to "hereby . . . pay" damages—which post-dates confirmation of the plan. [Dkt. 5-1, p. 144–45].

*Second*, Select cannot demonstrate—and does not allege—there was antagonism or a claim pending between Select and Plaintiffs as of the date of the reorganization. *See Craig's Stores*, 266 F.3d at 391. Rather, Plaintiffs did not plead a claim until August 22, 2023 and there was no antagonism between the parties pre-confirmation. [Dkt. 1-1, Exhibit A-2].

***Third***, there are no facts or law deriving from the reorganization or the plan necessary to the claim. *See Craig's Stores*, 266 F.3d at 391. Rather, "[n]othing in [Basic's] reorganization plan is necessary to the disposition of the . . . claims." *Chesapeake*, 70 F.4th at 285. Instead, Plaintiffs' claims only concern whether a liability adjudicated against Basic subsequent to confirmation is included within the scope of the liabilities assumed by Select. There is nothing in the plan affecting the scope of the liabilities agreed to by Select.

### (3)        *There is no supplemental jurisdiction over post-transaction claims.*

Moreover, even assuming (for the sake of argument only) that the Court has jurisdiction over whether the *Final Judgment* is an "assumed liability," no supplemental jurisdiction exists as to Plaintiffs' claims that Select's own injection of saltwater (***after*** Select took ownership of the assets from Basic) caused injury to Plaintiffs' wells. *See Matter of Walker*, 51 F.3d a562, 571 (5th Cir. 1995) ("In light of the Supreme Court admonishments in *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed 2d 593 (1989), and our reading of the statutes we find the bankruptcy courts' reasoning unpersuasive, and we conclude that bankruptcy courts may not exercise supplemental jurisdiction."); *see also In re Morrison*, 419 B.R. 314, 322 (Bankr. S.D. Tex. 2009) ("This Court does not have authority to exercise supplemental jurisdiction."); *In re Dunhill Res., Inc.*, Bankruptcy No. 03-41264-H2-7, 2006 WL 2090208, at *3 (Bankr. S.D. Tex. June 27, 2006) ("[T]he bankruptcy court does not have supplemental jurisdiction."); *In re Ultra Petroleum Corp.*, Case No. 16-32202, 2019 WL 2524936, at *8 (Bankr. S.D. Tex. Jan. 9, 2019); *see Nat'l Liab. & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 834 (5th Cir. 2014) (Texas substantive law applies to breach of contract cases); *Sw. Insulation, Inc. v. Gen. Insulation Co.*, Civ. Action No. 4:15-cv-601-O, 2015 WL 13450817, at *2 (N.D. Tex. Nov. 23, 2015) ("The Court

will analyze each agreement under the Texas breach of contract standard since diversity jurisdiction applies and the *Erie* Doctrine dictates the Court to apply Texas substantive state law.").

**B.      The forum selection provision does not create federal jurisdiction.**

Select contends Section 11.06 (the forum selection provision) of the Asset Purchase Agreement provides jurisdiction to this Court.   [Exhibit A].   Not so.   It is axiomatic that parties cannot agree to "create" federal question jurisdiction by agreement.   *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 786 (5th Cir. 2012); *Buchner v. FDIC*, 981 F.2d 816, 818 (5th Cir. 1993) ("[P]arties . . . may neither . . . confer subject matter jurisdiction on the district court nor strip it of such jurisdiction by agreement or waiver."); *Bowe v. New Airlines, Inc.*, 974 F.2d 101–03 (8th Cir. 1992) ("Parties to an agreement cannot create federal subject matter jurisdiction by consent.") (quoting *Jader v. Principal Mut. Life Ins. Co.*, 925 F.2d 1075, 1077 (8th Cir. 1991)).

Indeed, several federal courts have flatly rejected the contention that parties can use a forum selection provision to "vest" federal courts with subject matter jurisdiction:

> Caspian argues that Rule 11 sanctions arising from Caspian's choice of forum are inappropriate because Vicom Video and Holdings agreed to a New York forum through a forum selection clause in the Agreement.   This contention is without merit.   Because parties cannot create federal subject matter jurisdiction by consent where it does not lie, the existence of a forum selection clause is irrelevant. The principle that subject matter jurisdiction cannot be created by consent is even more basic than the alien diversity rule, and counsel's misapprehension regarding this principle does not excuse the filing of the complaint where no subject matter jurisdiction existed.

*Caspian Invs., Ltd. v. Vicom Holdings, Ltd.*, 770 F.Supp. 800, 886 (S.D.N.Y. 1991); *see also Affine Commc'ns, LLC v. ezTel Commc'ns, LLC*, No. IP 02-0315-C-BS, 2002 WL 1461698, at *2 (S.D. Ind. June 28, 2002) ("Moreover, under settled legal principles, parties cannot create exclusive

federal jurisdiction in a particular venue simply by fashioning a forum selection clause to that effect; the elements supporting federal jurisdiction must be satisfied as a matter of law.").

## V.
### CONCLUSION AND RELIEF SOUGHT

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court: (a) grant *PPC Energy, LP and Priest Petroleum Corporation's Statement of Non-Consent and Motion to Remand*; (b) remand this action to the 157th Judicial District of Harris County, Texas; (c) direct the clerk of court to effect remand in accordance with the usual procedure; and (d) order recovery of Plaintiffs' reasonable and necessary fees incurred in bringing this motion.

Respectfully submitted,

*/s//s/Michael K. Reer with permission by dcb*
Jeff P. Prostok
State Bar No. 16352500
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com

and

Michael K. Reer
S.D. Tex. ID. 3272174
State Bar No. 24088281
mreer@hfblaw.com
**HARRIS, FINLEY & BOGLE, P.C.**
777 Main Street, Suite 1800
Fort Worth, Texas 76102
Telephone No.: (817) 870-8700
Facsimile No.: (817) 332-6121

**ATTORNEYS FOR PLAINTIFFS
PPC ENERGY, LP AND PRIEST
PETROLEUM CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the motion to remand has been served on all parties and counsel of record in compliance with the Federal Rules of Civil Procedure on this 29th day of September 2023.

*/s/Michael K. Reer with permission by dcb*
Michael K. Reer

## CERTIFICATE OF CONFERENCE

Pursuant to LR 7.1(d), the undersigned hereby certifies that the attorney for movant held a conference with the attorney for respondent (Mr. Leu) on and before September 26, 2023.  After explaining the basis of this motion, and the arguments in support of the same, Mr. Leu opposed this motion because of differences of opinion regarding the law surrounding the removal of this action.  Accordingly, this motion is being presented to the Court for determination.

*/s/Michael K. Reer with permission by dcb*
Michael K. Reer

# EXHIBIT A

**Emily Tipping**

| | |
|---|---|
| **From:** | Leu, Jordan <jleu@velaw.com> |
| **Sent:** | Sunday, September 24, 2023 5:49 PM |
| **To:** | Michael Reer; Mitsch, Tom; Desireé Malone |
| **Subject:** | Re: Priest v. Select - Notice of Removal to Bankruptcy Court |


We have ample grounds for removal under the law and the facts but are not required to marshal anything now in response to an email.  Indeed, as purported third-party beneficiaries of the APA (which we dispute), Plaintiffs are bound by the forum-selection clause in § 11.06 of the APA and violated that clause by bringing the case in state court.  We will not voluntarily remand and will respond to any filing Plaintiffs make in due course.  We reserve all rights as related to the violation of the forum-selection clause.


Jordan W. Leu
Partner



E   jleu@velaw.com
W   +1.214.220.7715

2001 Ross Avenue
Suite 3900
Dallas, TX 75201

Vcard   |   Bio   |   velaw.com


**From:** Michael Reer <MReer@hfblaw.com>
**Sent:** Wednesday, September 20, 2023 6:43:28 AM
**To:** Mitsch, Tom <tmitsch@velaw.com>; Desireé Malone <DMalone@hfblaw.com>
**Cc:** Leu, Jordan <jleu@velaw.com>
**Subject:** RE: Priest v. Select - Notice of Removal to Bankruptcy Court


[EXTERNAL]

Good morning,

I have review the removal documents you provided.  My understanding of PPC's pleading and the facts of the Basic bankruptcy case are as follows:

- PPC's claims against Select are a post-confirmation dispute, arising after confirmation of Basic's plan.
- PPC's claims against Select do not "relate to" Title 11 because the outcome of the action will not either:  (1) alter the rights, obligations, and choices of action of the debtor; or (2) have an effect on the administration of the bankruptcy estate.

I am providing a case that I believe is on point.  If you believe I have an incorrect understanding of the facts or law please let me know.

The purpose of this e-mail is to inquire whether Select will voluntarily remand the action back to state court.  If not, please provide me any facts or law that you believe support federal bankruptcy court jurisdiction before Monday.

Thank you in advance for your kind attention to this matter,

1

Michael



**Michael Reer**
Attorney at Law
777 Main Street, Suite 1800
Fort Worth, Texas  76102
817-870-8741 (direct)
817-333-1161 (fax)
MReer@hfblaw.com

CONFIDENTIALITY NOTICE:  Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this message is privileged and confidential, intended for the use of the intended recipient named above.  If the reader of this message is not the intended recipient (or the employee or agent responsible to deliver it to the intended recipient), you are hereby notified that any dissemination, distribution, or copying of this communication is prohibited.  If you have received this communication in error, please reply to the sender that you have received this message in error and delete this message.

**From:** Mitsch, Tom <tmitsch@velaw.com>
**Sent:** Monday, September 18, 2023 9:45 AM
**To:** Michael Reer <MReer@hfblaw.com>; Desireé Malone <DMalone@hfblaw.com>; James Key <Jkey@hfblaw.com>
**Cc:** Leu, Jordan <jleu@velaw.com>
**Subject:** Priest v. Select - Notice of Removal to Bankruptcy Court

Counsel,

Attached please find the notices of removal that were filed this morning pertaining to the above-referenced matter.

Best,
Tom

**Tom Mitsch**
Senior Associate



E    tmitsch@velaw.com
W   +1.214.220.7843
M   +1.952.836.5639

2001 Ross Avenue
Suite 3900
Dallas, TX 75201

Vcard   |   Bio   |   velaw.com

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

Thank You.

**Emily Tipping**

| | |
|---|---|
| **From:** | Michael Reer <MReer@hfblaw.com> |
| **Sent:** | Wednesday, September 20, 2023 6:43 AM |
| **To:** | Mitsch, Tom; Desireé Malone |
| **Cc:** | Leu, Jordan |
| **Subject:** | RE: Priest v. Select - Notice of Removal to Bankruptcy Court |
| **Attachments:** | In re Reliant Exploration Ltd.pdf |

Good morning,

I have review the removal documents you provided.  My understanding of PPC's pleading and the facts of the Basic bankruptcy case are as follows:

- PPC's claims against Select are a post-confirmation dispute, arising after confirmation of Basic's plan.
- PPC's claims against Select do not "relate to" Title 11 because the outcome of the action will not either:  (1) alter the rights, obligations, and choices of action of the debtor; or (2) have an effect on the administration of the bankruptcy estate.

I am providing a case that I believe is on point.  If you believe I have an incorrect understanding of the facts or law please let me know.

The purpose of this e-mail is to inquire whether Select will voluntarily remand the action back to state court.  If not, please provide me any facts or law that you believe support federal bankruptcy court jurisdiction before Monday.

Thank you in advance for your kind attention to this matter,

Michael



Michael Reer
Attorney at Law
777 Main Street, Suite 1800
Fort Worth, Texas  76102
817-870-8741 (direct)
817-333-1161 (fax)
MReer@hfblaw.com

CONFIDENTIALITY NOTICE:  Unless otherwise indicated or obvious from the nature of this transmittal, the information contained in this message is privileged and confidential, intended for the use of the intended recipient named above.  If the reader of this message is not the intended recipient (or the employee or agent responsible to deliver it to the intended recipient), you are hereby notified that any dissemination, distribution, or copying of this communication is prohibited.  If you have received this communication in error, please reply to the sender that you have received this message in error and delete this message.

**From:** Mitsch, Tom <tmitsch@velaw.com>
**Sent:** Monday, September 18, 2023 9:45 AM
**To:** Michael Reer <MReer@hfblaw.com>; Desireé Malone <DMalone@hfblaw.com>; James Key <Jkey@hfblaw.com>
**Cc:** Leu, Jordan <jleu@velaw.com>
**Subject:** Priest v. Select - Notice of Removal to Bankruptcy Court

Counsel,

Attached please find the notices of removal that were filed this morning pertaining to the above-referenced matter.

Best,
Tom

**Tom Mitsch**
**Senior Associate**



E   tmitsch@velaw.com
W   +1.214.220.7843
M   +1.952.836.5639

2001 Ross Avenue
Suite 3900
Dallas, TX 75201

**Vcard**   |   **Bio**   |   **velaw.com**

---

---

**CONFIDENTIALITY NOTICE:** The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

Thank You.

---

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Doctors Hosp. 1997, L.P., Bankr.S.D.Tex., October 5, 2006

336 B.R. 286
United States Bankruptcy Court,
S.D. Texas,
Corpus Christi Division.

In re RELIANT
EXPLORATION LTD., Debtor.

Reliant Exploration Creditors' Trust, Plaintiff,

v.

Opus Oil & Gas LP, et al., Defendants.

Bankruptcy No. 01–24229.
|
Adversary No. 05–2025.
|
Dec. 15, 2005.

**Synopsis**

**Background:** Creditors' trust brought cause of action to recover for party's alleged breach of terms of overriding royalty conveyance that was negotiated and executed by trust, and approved by bankruptcy court, in connection with confirmation of bankrupt energy exploration company's Chapter 11 plan nearly three years earlier.

**Holdings:** On motion to dismiss, the Bankruptcy Court, Richard S. Schmidt, J., held that:

[1] cause of action was not one over which bankruptcy court could exercise even "related to" jurisdiction, as not involving any property of the estate or having any conceivable effect thereon; and

[2] cause of action was not within "core" jurisdiction of bankruptcy court.

Motion granted; proceeding dismissed.

West Headnotes (9)

**[1]  Bankruptcy** 🔑 Limited, in personam, and in rem jurisdiction

Bankruptcy courts are courts of limited jurisdiction and derive their jurisdiction solely from statute. 28 U.S.C.A. §§ 157, 1334.

**[2]  Bankruptcy** 🔑 Core, Non-Core, or Related Proceedings in General;  Nexus

**Bankruptcy** 🔑 Related proceedings

Bankruptcy courts may exercise jurisdiction over proceeding only if it is one "arising under," "arising in," or "related to" a case under Title 11. 28 U.S.C.A. §§ 157, 1334.

**[3]  Bankruptcy** 🔑 Core, Non-Core, or Related Proceedings in General;  Nexus

Bankruptcy court may exercise "arising under" jurisdiction only over issues that are specifically presented to it through formal bankruptcy petition. 28 U.S.C.A. §§ 157, 1334.

**[4]  Bankruptcy** 🔑 Related proceedings

To decide whether proceeding is within "related to" jurisdiction of bankruptcy court, court must determine whether outcome of proceeding could conceivably have any effect on estate being administered in bankruptcy. 28 U.S.C.A. §§ 157, 1334.

**[5]  Bankruptcy** 🔑 Related proceedings

Proceeding is within "related to" jurisdiction of bankruptcy court if its outcome could alter debtor's rights, liabilities, options, or freedom of action, either positively or negatively, and it in any way impacts on handling and administration of bankruptcy estate; for bankruptcy court jurisdiction to attach under "related to" test, outcome of proceeding must both (1) alter rights, obligations, and choices of action of debtor, and

(2) have effect on administration of bankruptcy estate. 28 U.S.C.A. §§ 157, 1334.

**[6]**  **Bankruptcy**  Construction, execution, and performance

Cause of action that was brought by creditors' trust against another non-debtor for its alleged breach of terms of overriding royalty conveyance that was negotiated and executed by trust, and approved by bankruptcy court, in connection with confirmation of bankrupt energy exploration company's Chapter 11 plan nearly three years before cause of action was filed was not cause of action over which bankruptcy court could exercise even "related to" jurisdiction, as not involving any property of the estate or having any conceivable effect thereon. 28 U.S.C.A. §§ 157, 1334.

**[7]**  **Bankruptcy**  Related proceedings

Mere fact that cause of action may share common facts with bankruptcy case is insufficient to permit bankruptcy court to exercise "related to" jurisdiction over this cause of action.

**[8]**  **Bankruptcy**  Construction, execution, and performance

Cause of action that was brought by creditors' trust against another non-debtor for its alleged breach of terms of overriding royalty conveyance that was negotiated and executed by trust, and approved by bankruptcy court, in connection with confirmation of bankrupt energy exploration company's Chapter 11 plan nearly three years before cause of action was filed was not cause of action over which bankruptcy court could exercise "core" jurisdiction; proceeding was in nature of run-of-the-mill contract dispute between two non-debtors, that did not involve any substantive right provided by Title 11, and that could have arisen outside of bankruptcy. 28 U.S.C.A. §§ 157, 1334.

**[9]**  **Bankruptcy**  Construction, execution, and performance

Bankruptcy court's retained jurisdiction following confirmation of Chapter 11 reorganization plan is not limitless, but extends only to concluding matters pending before it prior to confirmation and to continuing to administer the estate as necessary, e.g., by resolving objections to claims.

1 Case that cites this headnote

**Attorneys and Law Firms**

***288**  Matthew A. Rosenstein, Corpus Christi, TX, for Debtor.

*MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE TO WITHDRAW THE REFERENCE*

RICHARD S. SCHMIDT, Bankruptcy Judge.

On this day came on for consideration the Motion to Dismiss Or, In the Alternative, to Withdraw the Reference filed by Opus Oil & Gas, Ltd. and Opus Energy, L.L.C. (collectively "Opus"), Defendants in the above-captioned adversary proceeding. The Court, having heard the evidence and arguments of counsel, and upon review of the pleadings, briefs & prior orders on file, finds that the Motion to Dismiss should be granted.

BACKGROUND

This case involves a lawsuit by Reliant Exploration Creditors' Trust (the "Trust"), against Opus for breach of the terms of an overriding royalty conveyance that was negotiated and executed by the Trust and approved by this Court in connection with the confirmation of the Debtor's plan. On December 28, 2001, Reliant Exploration, Ltd. ("Reliant" or "Debtor") filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Court"). An Amended Joint Plan of Reorganization (the "Plan") was confirmed by the Court

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

on August 20, 2002, pursuant to which Reliant agreed to subsequently convey an overriding royalty interest (the "ORRI") in all oil and gas leases owned by it to the Trust. The override was granted through an Overriding Royalty Interest Conveyance (the "ORRI Conveyance") dated September 9, 2002. The predecessor to the Trust, the Creditors' Committee, was a proponent of the Plan and made no objection to the Plan or the Order confirming it. Pursuant to the Plan, Opus purchased all of the property and leases of Reliant, subject to the ORRI, on September 10, 2002, and agreed to grant the Trust an ORRI on all leases it acquired in the future. Opus thereby became Reliant's successor to the ORRI Conveyance.

The crux of this dispute is the manner in which the ORRI is calculated and whether the royalty is to be calculated from the leases on a global or well-by-well basis. The Trustee objects to Opus using revenue from producing wells to plug and abandon non-producing wells. The Trustee argues that Opus cannot use revenue from one well to cover expenses from another. Opus disagrees and contends that the ORRI Conveyance allows such allocation of expenses.

The Trustee participated in the negotiation of the ORRI Conveyance and agreed to its terms. The ORRI Conveyance was **\*289** approved by all parties and was approved by the Court. *See* Order Confirming Amended Joint Plan of Reorganization at pp. 3–4. (".... the ORRI ... and all amendments, modifications and restatements thereof, and all terms and conditions ... are approved"). Following approval by the Court and after confirmation of the Plan, the parties (or their predecessors) executed and entered into the ORRI Conveyance. Thus, the ORRI Conveyance is the document governing the Trustee's and Opus' rights and obligations. The Order Confirming the Plan allowed and approved subsequent amendments to the ORRI. This suit is simply a contract dispute between the Trustee and Opus.

## DISCUSSION

 **[1]** **[2]** Bankruptcy courts are courts of limited jurisdiction and derive their jurisdiction solely from statute. *In re Bass,* 171 F.3d 1016, 1022 (5th Cir.1999). Pursuant to 28 U.S.C. §§ 1334, 157, bankruptcy courts are granted jurisdiction over matters that "arise under," "arise in," and "relate to" cases under Title 11 or cases that are "core" proceedings. Unless a case falls into one of these categories, a bankruptcy court cannot exercise jurisdiction.

 **[3]** "Arises under" jurisdiction only confers jurisdiction to a bankruptcy court over issues that are specifically presented to it through a formal bankruptcy petition. *In re Canion,* 196 F.3d 579, 584 (5th Cir.1999) ("the first category ['arises under'] refers merely 'to the bankruptcy petition itself' "); *Matter of Wood,* 825 F.2d 90, 92 (5th Cir.1987) ([arises under] refers merely "to the bankruptcy petition itself"). No dispute involving a bankruptcy petition is at issue in this case. No party to this case has filed a bankruptcy petition and, following confirmation of the Reliant Plan, no additional issues are presented through Reliant's bankruptcy petition. Thus, there is no basis for the Court to assert jurisdiction under the "arises under" language of 28 U.S.C. § 157 or 28 U.S.C. § 1334. *Id.*

 **[4]** **[5]** Because this dispute does not "arise under" Title 11, the next step in the Court's analysis is to determine whether the dispute "arises in" or "relates to" Title 11. In order to make this determination, the Fifth Circuit has ruled that it is only necessary to determine whether a matter is at least "related to" the bankruptcy. *In re Bass,* 171 F.3d at 1022; *In re Canion,* 196 F.3d at 584–85; *Matter of Wood,* 825 F.2d at 93. "Related to" is a term of art and means that this Court must determine whether the outcome of this proceeding "could conceivably have any effect on the estate being administered in bankruptcy." *Bass,* 171 F.3d at 1022; *Canion,* 196 F.3d at 585. Further, an action is "related to" a bankruptcy "if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and ... in any way impacts upon the handling and administration of the bankrupt estate." *In re Bass,* 171 F.3d at 1022 (internal citations omitted). It is well established that a bankruptcy court's "related to" jurisdiction is not limitless. *Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). In order for bankruptcy court jurisdiction to attach under the "related to" test, the outcome of an action must both: (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the bankruptcy estate. *Id.* This case does not meet those requirements.

 **[6]** **[7]** The case at bar is a dispute between two non-debtors, arises nearly three years after Reliant's Plan was confirmed and does not involve any property of a bankruptcy estate. Accordingly, it is not "related to" a bankruptcy. The outcome **\*290** of this action will not affect the Debtor or its bankruptcy estate. The Trustee's basis for jurisdiction is merely that the ORRI Conveyance was described within the Plan. However, this is insufficient to confer jurisdiction

under the test set forth in *Canion, Bass,* and *Wood* for "related to" jurisdiction. Merely because an action may share common facts with a bankruptcy does not confer "related to" jurisdiction on the Court. *Matter of Zale Corp.,* 62 F.3d 746, 753 (5th Cir.1995). The fact that the ORRI was described in the Plan, the ORRI Conveyance was executed shortly after the Plan was confirmed and the ORRI Conveyance involves assets that formerly belonged to the debtor is not enough to establish "related to" jurisdiction under the Fifth Circuit's standard. This case is simply a contract dispute regarding a contract entered post-confirmation.

 **[8]**    Nor does jurisdiction exist on the grounds that this is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A) and (b)(2)(O). The Fifth Circuit has held that a "core proceeding" is one that "invokes a substantive right provided by Title 11 or ... [one] that, by its nature, could arise only in the context of a bankruptcy case." *Matter of Wood,* 825 F.2d at 97. In this case, there is no substantive rights provided by Title 11. The Trustee does not allege or contend that a "right" granted to it under Title 11 has been violated. Further, the Trustee does not argue and cannot show that this is a proceeding that could arise only in the context of a bankruptcy case. This is a simple case related to the interpretation of a contract —— the ORRI Conveyance —— and is a run-of-the-mill type dispute which is generally brought outside of the context of bankruptcy in state courts.[1]

The Fifth Circuit held that post-confirmation disputes such as this one typically do not give rise to bankruptcy court jurisdiction. *In re Craig's Stores of Texas, Inc.,* 266 F.3d 388 (5th Cir.2001). In *Craig's,* the District Court refused to exercise jurisdiction over a dispute regarding the interpretation of an agreement that was assumed and made part of a debtor's reorganization plan that was approved by the bankruptcy court. *Id.* at 389. Upon appeal, the Fifth Circuit upheld dismissal of the case for lack of jurisdiction on the grounds that once a debtor's plan is confirmed, "the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist ..." *Id.* at 390. A bankruptcy court is then without jurisdiction to hear disputes between parties. *Id; see also, In re TransAmerican Natural Gas Corp.,* 127 B.R. 800, 803–04 (S.D.Tex.1991) (holding that royalty owner's claim for debtor's alleged breach of duty in post-confirmation settlement of contract did not accrue prior to plan confirmation and was not part of bankruptcy plan; deciding bankruptcy estate ceased to exist upon confirmation of reorganization plan); *In re J.T. Gerken Trucking, Inc.* 10 B.R. 203, 204 (Bankr.N.D.Ohio 1981) (concluding that bankruptcy court's affirmation in the

plan of the contract at issue did not confer jurisdiction on the court over post-confirmation controversies arising from the contract). If the Court were to adopt the Trustee's contention that jurisdiction exists over this contractual dispute, the bankruptcy would continue for years to come, even though the Plan has been confirmed. Each time a dispute occurred as **\*291** to the manner in which the ORRI is to operate, this Court would be charged with resolving the dispute under the Trustee's all-encompassing view of the Court's jurisdiction. This would result in perpetual jurisdiction by this Court over matters outside the scope of its authority. No basis exists for this Court to resolve this post-confirmation, non-bankruptcy dispute and it should be dismissed.

 **[9]**    Finally, this Court's retained jurisdiction following confirmation of a reorganization plan is not limitless. Bankruptcy Rule 3020(d) addresses the extent of the bankruptcy court's retained power following plan confirmation. The Rule states that "[n]otwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Bankr.Rule 3020(d). The Court's retained jurisdiction is limited to concluding "matters pending before it prior to confirmation and to continue to administer the estate as necessary, e.g., resolving objection to claims." Advisory Committee Notes to Bankr.Rule 3020(d). As noted above, the ORRI Conveyance was executed on September 9, 2002, after the Plan's confirmation on August 30, 2002. Furthermore, the ORRI Conveyance was merely described in the Plan and was not incorporated into the Plan. Therefore, the interpretation of and the parties' performance under the ORRI Conveyance were not matters pending "prior to confirmation." As a result, the Court did not retain power to indefinitely oversee Opus' and the Trust's performance of the terms of the ORRI Conveyance once the Plan had been confirmed and the ORRI had been created.

Although the plan contemplated the grant of the ORRI to the Trust, it is beyond the scope of the Court's retained jurisdiction to oversee the ORRI Conveyance once it has been executed and granted to the Trust pursuant to the Plan. In relation to the ORRI, the Court's implementation of the Plan was limited to three distinct matters: (1) the creation of the ORRI; (2) the approval of the form of the ORRI; and (3) the execution of the ORRI Conveyance by the parties post-confirmation. *See, i.e.,* Plan § 5.01(e) (establishing carve out of the ORRI); § 5.10 (requiring the form of the ORRI to be filed with the Court and requiring it to be executed at some undefined time); § 10.01(h) (listing approval of the ORRI's

form as a condition precedent to confirmation of the plan). Once those three distinct matters had been completed, the Plan was implemented, executed and completed as it related to the ORRI and this Court's jurisdiction regarding the ORRI ceased.

There is no dispute that the override was submitted to the Court before the Plan was confirmed, thereby completing and executing the Plan. *See* Order Confirming Amended Joint Plan of Reorganization at pp. 3–4. Additionally, the Court gave its approval to the ORRI Conveyance by stating that the "ORRI ... and all amendments, modifications and restatements thereof, and all terms and conditions thereof, are hereby approved." *Id.* at p. 4. Finally, the Trustee approved the ORRI Conveyance as a condition precedent to the Court's confirmation of the Plan. (*See,* Findings of Fact and Conclusions of Law for the Confirmation of the Amended Joint Plan of Reorganization at p. 13.) The purpose of the Plan, as it related to the ORRI, was implemented post-confirmation when the ORRI was formally conveyed to the Trust.

In Section 11.01(a) of the Plan, the Court retained jurisdiction to ensure that the purpose and intent of the Plan were carried out. As set forth above in connection to the ORRI, the purpose of the Plan was the creation and approval of the ORRI **\*292** Conveyance prior to confirmation of the Plan. The ORRI was created, approved, and executed as required by the Plan. The signed Order Confirming Amended Joint Plan of Reorganization notes that the ORRI Conveyance was filed of record with the Court on August 9, 2002. Moreover, the Order specifically approved the "terms and conditions" of the ORRI Conveyance. Thus, the purpose of the Plan was fulfilled when the ORRI was formally conveyed to the Trust post-confirmation, and there are no matters remaining for the Court to supervise regarding the ORRI. The pending dispute between the bankruptcy creditors' trustee and the successor-in-interest to the bankrupt entity's assets over whether the accounting under the ORRI Conveyance has been correctly done is purely a state law issue over which this Court lacks jurisdiction.

However, nothing in this Memorandum Opinion constitutes an interpretation of the ORRI Conveyance or a finding that either Opus or the Trust's interpretation is correct. Nor does this Memorandum Opinion prohibit a Court of competent jurisdiction from looking to the Plan of Reorganization, the Order Confirming the Plan of Reorganization, and any other bankruptcy pleading or order in its process of interpreting the ORRI Conveyance or the intent of the parties in executing the ORRI Conveyance.

CONCLUSION

The Court should dismiss this Adversary Proceeding because it does not have subject matter jurisdiction to hear the dispute. This action does not "arise in," "arise under," or "relate to" the Reliant Exploration bankruptcy. Instead, this action is a post-confirmation contract dispute between non-debtors and does not involve any property belonging to the bankruptcy estate. The overriding royalty interest contract at issue was entered after the confirmation of the reorganization plan. Thus, this action, which arises nearly three years after the bankruptcy proceeding, can have no conceivable effect on the bankruptcy estate, which ceased to exist following the reorganization plan's confirmation. No basis exists for the Court to hear this dispute under 28 U.S.C. § 157 or 28 U.S.C. § 1334. Accordingly, this action should be dismissed.

It is therefore ORDERED that the Defendants' Motion to Dismiss is hereby GRANTED and Adversary Proceeding No. 05–2025 is hereby DISMISSED.

**All Citations**

336 B.R. 286

Footnotes

1   Based on Opus' request for a jury trial, even if the Court retained jurisdiction, the case would have to be tried to the U.S. District Court. Thus, in either event, a court other than the Bankruptcy Court would be interpreting the ORRI and, if the Trustee is correct, the Plan of Reorganization.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

Case 23-03208   Document 7   Filed in TXSB on 09/29/23   Page 25 of 43

Affine Communications, LLC v. ezTel Communications, LLC, Not Reported in F.Supp.2d...

2002 WL 1461698

2002 WL 1461698
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

AFFINE COMMUNICATIONS LLC f/k/
a Iquest Communications LLC, Plaintiff,

v.

EZTEL COMMUNICATIONS
LLC, Defendant.

No. IP 02-0315-C-BS.
|
June 28, 2002.

**Attorneys and Law Firms**

Randolph G. Holt, Parr Richey Obremskey & Morton,
Indianapolis, IN, for plaintiff.

Erick P. Knoblock, Dale & Eke Pc, Indianapolis, IN, for
defendant.

***ENTRY ON MOTION TO DISMISS FOR IMPROPER
VENUE***

SARAH EVANS BARKER, Judge.

**\*1** Plaintiff Affine Communications ("Affine")
and Defendant ezTel Communications ("ezTel")
entered into an Authorized Representative Agreement
("Agreement"), providing that Affine would market ezTel's
telecommunications services in exchange for certain specified
commissions. The Agreement contained a forum selection
clause, stipulating that Mississippi law would govern all
disputes arising from the Agreement and directing such
disputes to "the U.S. District Court." Plaintiff has filed a
breach of contract action in the Southern District of Indiana,
alleging that Defendant failed to pay the commissions
required by the Agreement, and Defendant has moved to
dismiss the action for improper venue. For the following
reasons, we *DENY* Defendant's Motion to Dismiss.

*Legal Issue*

A motion to dismiss for improper venue based on a forum
selection clause is reviewed under Rule 12(b)(3). *Weidner
Communications, Inc. v. H.R.H. Prince Bandar Al Faisal,*
859 F.2d 1302, 1306 (7th Cir.1988); *Chapman v. Norwegian
Cruise Line Ltd.,* 2001 WL 910102, at *1 (N.D.Ill.2001).
Neither party to this action disputes the validity of this forum
selection clause, but the two have starkly contrasting views as
to its proper interpretation. While the majority view suggests
that federal law, rather than state law, governs the validity a
forum selection clause, the Seventh Circuit has not expressly
decided which should govern questions of interpretation. *See
Northwestern Nat'l Ins. Co. v. Donovan,* 916 F.2d 372, 374
(7th Cir.1990) (discussing cases and stating, without deciding
the issue, that federal law "probably" controls the issue of the
validity of forum selection clause). It is unnecessary to resolve
conclusively the question of the applicable law, however,
where the particular state law at issue and federal law lead to
the same conclusion. *Id.; Hanson Engineers Inc. v. UNECO,
Inc.,* 64 F.Supp.2d 797, 800 (C.D.Ill.1999).

Here, Plaintiff argues that Mississippi law governs the
interpretation of the forum selection clause, while Defendant
advocates reliance on federal law. We will sidestep this
dispute, however, because the federal common law rules
of contract interpretation substantially resemble those of
Mississippi and, when applied, lead to the same conclusion.
Federal law requires that we first determine whether the
contractual clause at issue is ambiguous. *Funeral Financial
Sys. V. U.S.,* 234 F.3d 1015, 1018 (7th Cir.2000); *Grun v.
Pneumo Abex Corp.,* 163 F.3d 411, 420 (7th Cir.1998), *cert.
denied,* 526 U.S. 1087 (1999), *citing Ryan v. Chromalloy
American Corp.,* 877 F.2d 598, 602 (7th Cir.1989). To make
this determination, we consider whether the relevant clause is
subject to reasonable alternative meanings when interpreted
"in an ordinary and popular sense as would a person of
ordinary intelligence." *Grun,* 163 F.3d at 420. Except in rare
cases where the unambiguous meaning of the contract would
lead to absurd results, we do not examine extrinsic evidence.
*Funeral Financial Sys.,* 234 F.3d at 1018; *Grun,* 163 F.3d at
420.

**\*2** By comparison, Mississippi law instructs that:
In construing a written instrument, the task of courts is to
ascertain the intent of the parties from the four corners of the
instrument. Courts look at the instrument under consideration
as a whole and determine what the parties intended by giving
a fair consideration to the entire instrument and all words used
in it. When a written instrument is clear, definite, explicit,
harmonious in all its provisions, and is free from ambiguity,

Case 23-03208   Document 7   Filed in TXSB on 09/29/23   Page 26 of 43

Affine Communications, LLC v. ezTel Communications, LLC, Not Reported in F.Supp.2d...

2002 WL 1461698

a court in construing it will look solely to the language used in the instrument itself.

Moreover, "the basic rule of contract interpretation is that it must be enforced according to its plain language." *Campbell v. Campbell,* 755 So.2d 518, 520 (Miss.App.1999); *see also Lehman-Roberts Co. v. State Highway Com'n of Miss.,* 673 So.2d 742, 743 (Miss.1996). When interpreting a written instrument, the Court's focus rests not on what the parties intended, but what they said, "for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy ." *Simmons v. Bank of Mississippi,* 593 So.2d 40, 42-43 (Miss.1992), *quoting UHS-Qualicare, Inc. v. Gulf Coast Community Hosp.,* 525 So.2d 746, 754 (Miss.1987). Disagreement by the parties over the meaning of a particular clause does not render that clause ambiguous. *Simmons,* 593 So.2d at 42-43. Instead, ambiguity exists where one clause is "open to two interpretations." *State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co.,* 797 So.2d 981, 986 (Miss.2001). In sum, both Mississippi and federal law confine our analysis to the express terms of the contract unless ambiguity exists.

Therefore, we begin with the text of the clause at issue. The Agreement's forum selection clause provides:
Except as otherwise required by tariff or Federal law, this Agreement shall be governed by Mississippi law with exclusive venue and jurisdiction of any dispute involving this Agreement in the U.S. District Court.

Defendant argues that this provision assigns exclusive jurisdiction and venue to the federal district courts of Mississippi. Plaintiff counters that the lack of reference to a particular state or district means that venue may properly lie in any of the federal district courts. We conclude that, when analyzed under either the federal or Mississippi standards, this forum selection clause clearly and unambiguously directs all related disputes to any of the federal district courts, not simply the district courts of Mississippi. Its bare terms

are not susceptible to multiple interpretations. The clause states only that venue is proper in "the U.S. District Court," without mentioning any geographical limitation on such venue. Despite the fact that the state of Mississippi is divided into two federal districts-the north and the south-this clause does not reference either (or both) of the Mississippi districts. Nor does it utilize the plural term "courts," which would at least suggest that venue should be restricted to the two district courts in the state of Mississippi. No ambiguity exists in this wording, other than that which Defendant attempts to create by disputing the plain text of the clause. Moreover, under settled legal principles, parties cannot create exclusive federal jurisdiction in a particular venue simply by fashioning a forum selection clause to that effect; the elements supporting federal jurisdiction must be satisfied as a matter of law.

**\*3** We test the appropriateness of this interpretation of the express terms of the Agreement by noting that it does not reduce the meaning of the forum selection clause to an absurdity. Forum selection clauses often reflect one or both parties' preference for a federal, as opposed to state, forum. There is no requirement that such clauses express a geographical preference as well. Moreover, directing contract disputes to fora outside the state whose law has been chosen to govern such disputes is not absurd; federal courts are routinely called upon to apply the laws of states other than those in which they sit. To speculate as to reasons underlying the absence of an express geographical preference in this forum selection clause, when, as here, the clause is not ambiguous, would require us to examine extrinsic matters that both federal and Mississippi law mandate we do not consider. Finding no ambiguity in the terms of the forum selection clause, and no absurdity in the conclusion that venue properly lies in any federal district court where Plaintiff files suit, we *DENY* Defendant's Motion to Dismiss.

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 1461698

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 2090208
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. Texas,
Houston Division.

In re: DUNHILL RESOURCES, INC., Debtor

Jeffrey A. Compton, Plaintiff

v.

Century Exploration New Orleans, Inc., f/k/
a Century Exploration Company, Defendant.

Bankruptcy No. 03–41264–H2–7.
|
Adversary No. 05–3640.
|
June 27, 2006.

**Attorneys and Law Firms**

Blaine F. Bates, Kourtney Pickens Lyda, Haynes & Boone LLP, Amy Pritchard Cole, Winstead Sechrest & Minick, Joseph G. Epstein, Winstead Sechrest et al., Houston, TX, for Debtor.

Gary W. Wright, Bracewell & Giuliani LLP, Houston, TX, for Defendant.

*MEMORANDUM OPINION IN SUPPORT OF ORDER GRANTING MOTIONS FOR JUDGMENT ON THE PLEADINGS (docs95, 107, 113, 122) and DISMISSING THIRD PARTY COMPLAINTS (docs 15, 23, 25, 27)*

STEEN, Bankruptcy J.

**\*1** Century Exploration New Orleans, Inc. ("Century") filed a number of third party complaints seeking indemnity or contribution for sums that the chapter 7 trustee seeks to collect from Century as fraudulent transfers. For reasons set forth below, by separate final judgment issued this date, the third party complaints are dismissed.

ALLEGATIONS AND UNDISPUTED FACTS

Dunhill Holdings Inc. ("Holdings") is the parent corporation of the debtor, Dunhill Resources, Inc. ("Debtor") and

(indirectly) of Dunhill Resources Mississippi ("Related Corporation").

Jeffrey Compton, in his capacity as chapter 7 trustee of Debtor's estate, is the Plaintiff in this adversary proceeding. In his complaint, Plaintiff alleges that Debtor transferred money to Century to pay the invoices that Century rendered to Related Corporation for operating Related Corporation's gas wells in the state of Mississippi. Plaintiff alleges that he can avoid the transfers and can recover the money from Century because Debtor had no ownership interest in the gas wells and received no other consideration for the transfer. In short, Plaintiff contends that Debtor's payment of Related Corporation's debt was a fraudulent transfer under uniformstate fraudulent conveyance law as well as under Bankruptcy Code § 550.

Century in turn filed third party complaints against Specialty Rental Tools & Supply LP ("STS"), T & T Welding Service, Inc. ("T & T"), BJ Services Company, USA ("BJ Services"), and Key Energy Fishing and Rental Services, L.P. ("Key") who are collectively referred to as Contractors and Suppliers.[1] Century alleges that the Contractors and Suppliers performed work for Century in connection with the operation of the gas wells, and that *some,* but not all, of the funds that Debtor paid to Century were intended ("earmarked") to pay invoices that the Contractors and Suppliers had rendered to Century. In its third party complaint, Century seeks indemnification or contribution from the Contractors and Suppliers.

The Contractors and Suppliers filed motions for judgment on the pleadings (docs95, 107, 113, 122).

LEGAL STANDARD

There is no dispute about the legal standard to apply. The Court recites Century's statement of that standard:

> "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 n. 8 (5th Cir.2000). In order to obtain judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), a party must show that a plaintiff can prove *no* set of facts in support of its claim that would entitle him to relief. *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999) (per curiam) (citation omitted). In ruling, the district court is confined to the pleadings and must accept all allegations contained in the

2006 WL 2090208

plaintiff's pleadings as true. *St. Paul Ins. Co. of Bellaire, Tex. v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir.1991).


ANALYSIS OF CLAIMS ASSERTED BY CENTURY

1. *Indemnity*

**\*2** Century cites no statutory authority for its claim of a right to indemnity. Century cites one bankruptcy case and two Mississippi cases that it contends give rise to a right of indemnity.

The first case Century cites is *Cassirer v. Sterling Nat'l Bank & Trust Co. of N.Y. (In re Schick),* 223 B.R. 661 (Bankr.S.D.N.Y.1998). That case is not controlling and is not even persuasive. That case was decided on agency principles, not a general right of indemnity for recovery of fraudulent transfers. Schlick is not relevant to the case at bar because there is no agency relationship alleged in this instant case.

But more important *Schick* stands for the opposite proposition for which Century cites it. Sterling Bank, the defendant in *Schick* had sold 100% of its loans to other financial institutions; Debtor paid money to Sterling in Sterling's capacity as agent for those other banks that owned the notes. In *Schick* Judge Bernstein expressly held that an initial transferee (like Century) does *not* have an implied right of indemnity against a subsequent transferee. Judge Bernstein denied the third party defendant's motion to dismiss only because the agency agreement between Sterling and the third party defendants might be read to include an express right of indemnity. Century's memorandum of authorities misrepresents Judge Bernstein's conclusion. The memorandum cites only the language of the opinion that states that the judge "... [could] not discount the possibility that Sterling could prove a set of facts that would entitle it to indemnity." But Century does not cite the reason that the judge could not discount that possibility. The reason that the judge stated was that:

> The participation agreements indicate that the Participants bore the risk of Schick's nonpayment. Sterling collected the debt and earned a commission. While the present situation does not involve Schick's nonpayment, but rather, the return of a payment that Schick actually made, I cannot discount the possibility that Sterling could prove a set of facts that would entitle it to indemnity.[2]

A fair reading of the opinion clearly shows that Judge Bernstein held that absent a written agency agreement there would be no right of indemnity and he would have granted the third party defendant's motion to dismiss for failure to state a claim.

Century cites two Mississippi cases for the proposition that there is an "implied" right of indemnity. But, as Century points out, the cases hold that:

> Two 'critical' prerequisites of noncontractual implied indemnity in Mississippi are: (1) The damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) it must appear that the claimant did not actively or affirmatively participate in the wrong.[3]

Assuming *arguendo* that Century correctly cites the law, it cannot prevail. Century alleges that it actively and affirmatively participated in the transaction by receiving the funds, allegedly knowing them to be allegedly earmarked for the Contractors and Suppliers, and Century admits that it transferred the funds to the Contractors and Suppliers with this alleged knowledge. Century thus alleges and admits that it participated actively and affirmative in the transaction that it alleges to be the "wrong".

**\*3** In *In re John Peterson Motors, Inc.,* 56 B.R. 588 (Bankr.D.Minn.1986), Judge Kressel held that there was no federal statute or common law that created a right to contribution or indemnity in a preference action.

> Presumably Borreson's claim for indemnity or contribution is based on state law. There is no federal general common law, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and "[a]bsent some Congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of states or our relations with foreign nations, and admiralty cases." *Texas Industries, Inc. v. Radcliff Materials,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). There is certainly nothing in Title 11 to suggest that Congress expressly or implicitly intended to create a right to contribution or indemnity.[4]

2006 WL 2090208

Although *Peterson* is a preference case, both preferences and fraudulent conveyances are recovered under the same Bankruptcy Code § 550. Therefore, the Court concludes that jurisprudence regarding preferences is also applicable to fraudulent transfers.

2. *Contribution*
Century cites no authority for its right to contribution, and the Court could find none.

There is authority determining that there is no right to contribution: *Weiboldt Stores, Inc. v. Schottenstein,* 111 B.R. 162 (N.D.Il.1990). The *Weiboldt* case is expanded upon by a casenote in the *Seton Hall Law Review* as reaching the right answer:

Thus there simply is no basis on which a right of indemnification or contribution can be found under federal common law. When asked by the third party plaintiffs in *Weiboldt* to fashion such a remedy under federal common law, the district court refused explaining, "in enacting the Bankruptcy Code Congress created a comprehensive legislative program providing for no right to contribution. This court refuses to fashion a new remedy that might disturb this carefully considered legislative scheme." There is no reason to think that other courts will find differently. The rationale of *Northwest Airlines, Inc. v. Transport Workers Union of America,* on which the *Weiboldt* court relied in finding no right to contribution under federal law, would likewise bar claims for indemnity. "As with contribution, such claims could only arise by implication under the statutes or under common law principles, and the same arguments would preclude recognition of indemnity under either theory."[5]

*Weiboldt* and the *Seton Hall Law Review* were both cited with approval by the Court of Appeals for the Fifth Circuit: *Matter of Walker* 51 F.3d 562 (5th Cir.1995).

SUBJECT MATTER JURISDICTION

In *Walker,* the Fifth Circuit further indicates that even if there were a third party claim under state law, the Bankruptcy Court would not have subject matter jurisdiction to hear it, because the bankruptcy court does not have supplemental jurisdiction. The Circuit even casts doubt on the district court's jurisdiction to exercise supplemental jurisdiction when acting in its bankruptcy jurisdiction:

**\*4** [W]e do not address the difficult question of whether a district court may address claims that are supplemental to its bankruptcy jurisdiction. See generally Susan Block–Lieb, The Case Against Supplemental Jurisdiction: A Constitutional, Statutory, and Policy Analysis, 62 FordhamL.Rev. 721 (1994) (discussing arguments against district court's exercising jurisdiction supplemental to their bankruptcy jurisdiction and describing cases).[6]

CONCLUSION

Century's claims against the Contractors and Suppliers is dismissed for failure to state a claim on which relief can be granted under federal law or under state law and judgment is rendered on the pleadings. And, to the extent that subject matter jurisdiction may exist under state law, the third party complaints are dismissed for want of subject matter jurisdiction.

All Citations

Not Reported in B.R., 2006 WL 2090208

Footnotes

1    Century filed other third party complaints, but those third party defendants did not file 12(b)(6) or 12(c) motions, and therefore are not addressed in this decision.

2    *Schick* at 664.

3    Century Memorandum, docket # 112, paragraph 12, page 7.

4    *Peterson* in footnote 5.

2006 WL 2090208

5    23 Seton Hall Law Review 1600 (1993).

6    *Walker* at 570.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2524936
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. Texas, Houston Division.

IN RE: ULTRA PETROLEUM

CORP., et al Debtor(s)

Southern California Public

Power Authority, et al Plaintiff(s)

v.

Ultra Resources, Inc., et al Defendant(s)

Case No: 16-32202
|
Adversary No. 17-03044
|
Signed 01/08/2019
|
Entered 01/09/2019

CHAPTER 11

REPORT AND RECOMMENDATION TO
WITHDRAW REFERENCE

Marvin Isgur, UNITED STATES BANKRUPTCY JUDGE

 *1  This Report and Recommendation involves two matters
—adversary proceeding No. 17-03044, and an objection to
claim filed in case No. 17-30560. Both disputes focus on
the allocation of liability for net profit payments owed under
various agreements covering oil and gas leases located in
Sublette County, Wyoming. The parties are all successors
in interest to the original parties to the agreements outlined
below.

The immediate issue before the Court is Anadarko E&P
Onshore LLC's Motion to Dismiss for Lack of Subject Matter
Jurisdiction.

On February 9, 2017, Southern California Public Power
Authority and Turlock Irrigation District initiated this
adversary proceeding against Ultra Resources, Inc. The filing
was prior to the confirmation of Ultra's Chapter 11 Plan of
Reorganization. Plaintiffs, as successors in interest, are non-
operating working interest owners of certain oil and gas leases
located in Sublette County, Wyoming. Ultra is the operator
for the Plaintiffs' leases on the Pinedale Fields. Plaintiffs
claim that, despite a Wyoming Supreme Court ruling over
the appropriate rights and obligations of the parties under
the Pinedale Leases, Ultra continues to miscalculate and
overcharge working interest owners for the NPI owed under
those leases. Ultra disputes the Plaintiffs' allegations.

On May 16, 2017, Ultra filed a counterclaim joining
Anadarko E&P Onshore LLC as a third-party defendant
in the current adversary proceeding. Subsequently, on June
28, 2018, Anadarko filed a Motion to Dismiss for Lack of
Subject Matter Jurisdiction, for Abstention, or for Judgment
on the Pleadings. Anadarko argues that the Court lacks
subject matter jurisdiction over Ultra's counterclaim, or,
alternatively, that even if the Court finds that subject matter
jurisdiction exists, it should decline from exercising such
in this case. Specifically, Anadarko argues that because
Ultra's counterclaim was filed post-confirmation, it is subject
to the Fifth Circuit's more restrictive post-confirmation
jurisdictional standard and fails under that standard. Ultra
maintains that the Court has subject matter jurisdiction over
Anadarko's claim, because it is inextricably intertwined
with the Plaintiffs' claims. Ultra further argues that both
the Plaintiffs' and Anadarko's claims should be litigated
together, so that the working interest owners are bound by one
judgment.

Tied into this dispute is case No. 17-30560, involving
Ultra's Proof of Claim in Vanguard's chapter 11 bankruptcy.
Vanguard Natural Resources, LLC, currently owns a non-
operating working interest in the Pinedale Leases similar
to the Plaintiffs. Shortly, after Vanguard filed for chapter
11 bankruptcy, Ultra filed Proof of Claim No. 680. A
substantial portion of Ultra's proof of claim is premised
on an amount allegedly owed under a Supplemental
Accounting Agreement. Ultra claims—as it does with the
Plaintiffs and Anadarko—that Vanguard has failed to make
payments under the Supplemental Accounting Agreement
in accordance with its terms and is therefore entitled to a
reimbursement. Vanguard maintains the same position as both
Plaintiffs and Anadarko—it owes no reimbursement amounts
to Ultra because Ultra continues to incorrectly calculate
the amounts owed under the Supplemental Accounting
Agreement contrary to the Wyoming Supreme Court's
decision.

**\*2** The dispute underlying both Anadarko's Motion to Dismiss, and Ultra's Proof of Claim in Vanguard's case concerns the effect of the Wyoming Supreme Court's rulings on each of the parties' obligations under the Pinedale Leases. For the reasons set forth below, the Court recommends that the District Court withdraw the reference to the Bankruptcy Court as to adversary proceeding No. 17-03044, and as to Vanguard's claim objection filed at ECF No. 1917 in case No. 17-30560.

**Background**

*I. The Net Profits Contract*

In the 1950s, Malco Refineries, El Paso Natural Gas Company, and Continental Oil Company (the "First Parties") sought to develop oil and gas interests in Sublette County, Wyoming. (ECF No. 1 at 5). Because Novi Oil Company ("Novi") controlled certain leases that the First Parties wanted to include in their development plans, the First Parties and Novi entered into an assignment agreement whereby Novi would assign three federal leases and one fee lease to the First Parties in exchange for payment of Net Profits Interest ("NPI"). (ECF No. 1 at 5).

On April 1, 1954, consistent with the requirements of the assignment agreement, Novi and the First Parties entered into the Net Profits Contract ("NPC"). (ECF No. 1 at 6). The NPC stated, in relevant part, that:

> First Parties agree to pay to Novi a sum or sums representing 5% of the net profits ... resulting from operations for oil and gas by First Parties .... In the event that leases other than said leases are committed to the Pinedale Unit, the manner of allocating production, revenue and expenses of unit operations shall be determined as provided in the Unit Agreement and such Unit Operating Agreement as First Parties and lessees of such other leases shall enter upon. Net profits as used herein shall mean the gross revenue ....

(ECF No. 1-1 at 2–3).[1]

The NPI is now owned by Novi's successors, some of which are composed of the NPI owners whom are a part of the Wyoming litigation described further below (the "Hartman Group"). (Case No. 17-30560, ECF No. 1367 at 6).

*II. The Supplemental Accounting Agreement*

On May 7, 1954, the First Parties entered into the Supplemental Accounting Agreement ("SAA"), with the purpose of governing the responsibilities for satisfying the NPI obligations created under the NPC. (ECF No. 1 at 6; ECF No. 12 at 6). In essence, the SAA provides a mechanism by which Ultra—the successor in interest to the original operators of the oil and gas leases—was to receive from the other working interest owners each parties' share of the NPI obligations burdening their respective leasehold interests. (Case No. 17-30560, ECF No. 1367 at 6).

At the time of their execution, both the NPC and the SAA anticipated the creation of a "Pinedale Unit Area." The agreements envisioned that the Unit would have "an operator collecting revenue from the non-operators, aggregating expenses associated with the NPI properties, performing the NPI calculations, making NPI payments, and reconciling revenues collected and expenses incurred with the various parties burdened by the NPI according to the SAA." (Case No. 17-30560, ECF No. 1367 at 6).

The language of the NPC, collectively with the rights and responsibilities set out in the SAA, have been the subject of litigation in Wyoming.

*III. The Hartman Litigation*

For a number of years, no NPI was paid by or to any party. (ECF No. 1 at 7). This prompted NPI Owners—successors in interest to Novi—to initiate a lawsuit in Wyoming state district court. (ECF No. 99 at 4). As a part of the litigation, "it became necessary for the District Court to determine the proper method for allocating the NPI burden among the individual working interest owners." (ECF No. 51 at 7).

**\*3** The Wyoming district court concluded that the NPI liability owed by each working interest owner must be determined by "dividing that party's revenues by the total revenues attributable to the NPI leases." *Ultra Res., Inc. v. Hartman*, 226 P.3d 889, 935 (Wyo. 2010). On appeal, the Wyoming Supreme Court affirmed, holding that the SAA requires calculation of the NPI Allocations based on revenues, not profits. *Id.* ("While we agree that the Unit NPI Contract focuses on net profits, that does not change the fact that the First Parties agreed to use the Supplemental Accounting Agreement to allocate the NPI burden among themselves and the Supplemental Accounting Agreement allocates on the basis of revenues.").

The parties, however, continue to dispute the method by which Ultra should make its NPI payment calculations. Ultra maintains the position that the SAA allocates the NPI payments on the basis of net profits. (Case No. 17-30560, ECF No. 1367 at 10). The non-working interest owners, on the other hand, argue that Ultra's incorrect calculations violate the SAA, are contrary to the Wyoming Supreme Court's ruling, and resulted in an overcharge to the non-working interest owners.

**Procedural History**

*I. The Anadarko Dispute*

Ultra Petroleum Corp., and seven of its subsidiary companies, including Ultra, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on April 29, 2016. (Case No. 16-32202, ECF No. 1). Anadarko did not file a proof of claim in those chapter 11 cases. (ECF No. 99 at 3). On March 14, 2017, the Court confirmed Ultra's Plan of Reorganization (the "Plan"). (Case No. 16-32202, ECF No. 1325). The Plan was substantially consummated on April 12, 2017. (*See* ECF No. 1731).

On February 9, 2017, Southern California Public Power Authority ("SCPPA") and Turlock Irrigation District ("TID"), collectively, Plaintiffs, initiated this adversary proceeding against Ultra, prior to confirmation of Ultra's chapter 11 Plan. (*See* ECF No. 1). Plaintiffs, as successors-in-interest, are non-operating working interest owners of certain oil and gas leases located in Sublette County, Wyoming ("Pinedale Field"). (ECF No. 1 at 1). Ultra is the operator of the Plaintiffs' leases in the Pinedale Field pursuant to, among other similar and applicable operating agreements, the Model Form Operating Agreement (the "Joint Operating Agreement") dated June 30, 2005. (ECF No. 1 at 2).[2]

Plaintiffs allege that since May 2014, Ultra has provided periodic invoices to Plaintiffs demanding payments of NPI amounts pursuant to Ultra's interpretation of the NPC and the SAA. (ECF No. 1 at 2). Plaintiffs argue that, despite the Wyoming Supreme Court's ruling, Ultra has been wrongfully calculating their NPI allocations based on the parties' respective *net profits,* as opposed to the parties' *gross revenue* derived from the Pinedale Field leases. (ECF No. 1 at 3). Plaintiffs maintain that Ultra's miscalculation of the working interest owners' apportioned liability for NPI caused both SCPPA and TID to overpay $2,484,650.55. (ECF No. 1 at

22). Plaintiffs seek an accounting and refund of their alleged overpayments.

On May 16, 2017, Ultra filed a Counterclaim and Joinder of Counter-Defendants pursuant to Federal Rule of Civil Procedure 20(a), seeking declaratory relief as to the parties' rights and obligations under the SAA and turnover amounts allegedly owed to Ultra by working interest owners. (*See* ECF No. 12; ECF No. 100 at 9). Pursuant to Ultra's counterclaim, Anadarko E&P Onshore, LLC was joined as a third-party defendant in the current adversary proceeding. (ECF No. 12). Anadarko was a working interest owner in the Pinedale Field until October 1, 2013, when it assigned its interests to Encore Energy Partners (now Vanguard Natural Resources, LLC). (ECF No. 99 at 5). In its counterclaim, Ultra "seeks a declaratory judgment regarding the proper method of allocating the net profits obligations among the working interest owners as well as an order requiring certain working interest owners to turn over property of the estate in the form of withheld reimbursements owed [to] Ultra for NPI payments Ultra has made to the net profits owners under the NPC." (ECF No. 12 at 5). Specifically, Ultra seeks $1,174,656.91 in reimbursement from Anadarko. (ECF No. 12 at 14). Anadarko denies that it owes Ultra any payments under the SAA and claims a right to setoff as an affirmative defense. (ECF No. 99 at 5).

**\*4** In response to Ultra's counterclaim and joinder, Anadarko filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, for Abstention, or for Judgment on the Pleadings on June 28, 2018. (*See* ECF No. 99). Anadarko argues that (i) the Court lacks subject matter jurisdiction over Ultra's counterclaim; (ii) if the Court finds it has subject matter jurisdiction, it should decline from exercising such in this case; or (iii) if the Court finds it has subject matter jurisdiction and declines to abstain, Anadarko is entitled to judgement on the pleadings. (*See* ECF No. 99). Specifically, Anadarko argues that jurisdiction does not exist because Ultra's claims will have no bearing on the implementation or execution of the Plan since the counterclaim was filed post-confirmation. (ECF No. 99 at 7–11). Alternatively, if subject matter jurisdiction exists, permissive abstention weighs against this Court exercising jurisdiction, and Ultra's turnover action fails on the pleadings because no estate exists which can receive the alleged debt. (ECF No. 99 at 11–17).

Ultra filed its Response to Anadarko's Motion to Dismiss on July 19, 2018. (*See* ECF No. 100). Ultra maintains that the Court has subject matter jurisdiction over Anadarko's

counterclaim pursuant to 28 U.S.C. §§ 1334 and 157, as a case "arising under," "arising in," or "related to" the Chapter 11 proceeding. (ECF No. 100 at 5). Ultra claims that its joinder of Anadarko as a party to this adversary proceeding is proper, "because Ultra's counterclaims arise from the same transactions and occurrences and involve the same legal and factual questions as the claims brought by SCPPA and TID." (ECF No. 100 at 9). Ultra further argues that even if this Court finds it lacks subject matter jurisdiction over its counterclaim, that the appropriate remedy is withdrawal of reference to the District Court as opposed to a dismissal. (ECF No. 110 at 7). Ultra asserts that keeping Anadarko as a third-party defendant in this adversary is warranted to "ensure that the entire dispute presented by SCPPA and TID's adversary proceeding is resolved at the same time, as efficiently as possible." (ECF No. 100 at 15).

The Court held a hearing on July 23, 2018 at which it requested further briefing from the parties on (i) a court's subject matter jurisdiction when a lawsuit and a third-party complaint in a lawsuit straddle the confirmation date; and (ii) whether the federal district court has subject matter jurisdiction, and if so, whether the appropriate relief is to recommend a withdrawal of reference rather than grant a motion to dismiss. (ECF No. 103 at 10–11). Both parties submitted their supplemental briefing on August 31, 2018. (ECF No. 110; ECF No. 111).

On September 5, 2018, the Court held it did not have subject matter jurisdiction over Ultra's counterclaim against Anadarko. (ECF No. 113 at 37). Consequently, the Court recommends that the District Court withdraw the reference as to adversary proceeding No. 17-03044.

### II. Vanguard's Case No. 17-30560
Concurrent with the development of the adversary case detailed above, is Vanguard's— Anadarko's successor in interest—own bankruptcy case. Vanguard Natural Resources, LLC, owns a non-operating working interest in certain mineral interests in the Pinedale Area of Sublette County, Wyoming. Vanguard filed for chapter 11 bankruptcy on February 1, 2017. (Case No. 17-30560, ECF No. 1). Vanguard's Plan of Reorganization was confirmed on July 18, 2017, with an effective date of August 1, 2017. (Case No. 17-30560, ECF No. 1917 at 2). On April 25, 2017, Ultra filed Proof of Claim Number 680, alleging a right to a secured claim in the aggregate amount of $1,829,947.51.

Initially, under its Second Amended Plan of Reorganization, Vanguard sought to assume "certain contracts with Ultra." (Case No. 17-30560, ECF No. 1232 at 1). As a consequence of the alleged assumption, Ultra filed an Objection to Cure Amounts, claiming that Vanguard owed Ultra two separate amounts under the contracts at issue— $47,673.00 under the SAA, and $2,447,207.92 under the JOAs—on July 14, 2017. (Case No. 17-30560, ECF No. 1065 at 4). Ultra also filed a Motion for Relief from Stay, seeking to join Vanguard in the adversary proceeding styled above. (Case No. 17-30560, ECF No. 1078). Ultra argued that lifting the stay to add Vanguard as a party to the adversary proceeding was appropriate given that Vanguard's claim was identical to those of the Plaintiffs. (Case No. 17-30560, ECF No. 1078 at 5). Vanguard opposed Ultra's motion to involve it in the adversary proceeding. (Case No. 17-30560, ECF No. 1139).

**\*5** On August 3, 2017, the Court ordered Ultra and Vanguard to file cross-motions for summary judgment on the portion of Ultra's cure claim concerning the proper methodology for allocating the NPI burden. (Case No. 17-30560, ECF No. 1232 at 2). The Court required that the parties agree to a "single schedule, applicable to all parties in both the Vanguard cases and the Ultra adversary proceeding." (Case No. 17-30560, ECF No. 1232 at 2). On August 8, 2017, the Court scheduled Vanguard and Ultra's motions for summary judgment "directed at the interpretation of the Net Profits Contract and the Supplemental Accounting Agreement in connection with [ ] Mediation." (Case No. 17-30560, ECF No. 1244 at 2).

In accordance with the Court's schedule, the parties filed a series of motions for summary judgment:

- Reorganized Debtors' Motion for Partial Summary Judgment on Cure Demand Filed by Ultra Resources Inc. (Case No. 17-30560, ECF No. 1363).

- Ultra Resources, Inc's Motion for Partial Summary Judgment. (Case No. 17-30560, ECF No. 1367).

- Ultra Resources, Inc.'s Consolidated Response to Plaintiff/Counter-Defendants' Motions for Summary Judgment. (Case No. 17-30560, ECF No. 1425).

- Reorganized Debtor's Objection to Ultra Resources, Inc.'s Motion for Partial Summary Judgment. (Case No. 17-30560, ECF No. 1431).

• Ultra Resources, Inc.'s Consolidated Reply to Reorganized Debtors' Motion for Partial Summary Judgment on Cure Demand. (Case No. 17-30560, ECF No. 1454).

On August 23, 2018, while the summary judgment motions were pending, Vanguard exercised its rights under its confirmed plan to reject its obligations under the SAA. (Case No. 17-30560, ECF No. 1916). That same day, Vanguard also objected to Ultra's Proof of Claim No. 680. (Case No. 17-30560, ECF No. 1917). Ultimately, the parties failed to reach an agreement through mediation, and the Court set a date to conduct a combined hearing to consider all pending motions for summary judgment.

Vanguard was present at the September 5, 2018 hearing at which the Court held that it did not have subject matter jurisdiction over Ultra's Counterclaim against Anadarko. (ECF No. 113 at 37). As a result, the Court did not reach the substantive questions presented in the summary judgment motions. (ECF No. 113 at 37). Furthermore, the legal and factual basis for Vanguard's objection to Ultra's proof of claim is identical to that of its Summary Judgment Motions —Ultra's alleged incorrect calculations of the amount owed under the Supplemental Accounting Agreement by non-operating working interest owners. (Case No. 17-30560, ECF No. 1917). Consequently, the Court recommends that the District Court withdraw the reference as to Vanguard's claim objection in case No. 17-30560, as it involves the same dispute presented in the above styled adversary case.

### Analysis

Pursuant to 28 U.S.C. § 157(d), a proceeding must be withdrawn from a bankruptcy court if the resolution of that proceeding "requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). "[W]ithdrawal must be granted if it can be established (1) that the proceeding involves a substantial and material question of both Title 11 and non-Bankruptcy Code federal law; (2) that non-Code federal law has more than a de minimis effect on interstate commerce; and (3) that the motion to withdrawal was timely." In re Nat'l Gypsum, 145 B.R. 539, 541 (N.D. Tex. 1992).

Even if withdrawal of the reference is not mandatory, 28 U.S.C. § 157(d) provides that the "district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d). In determining whether cause exists for reference in this case to be withdrawn, courts weigh six factors: (i) the goals of promoting uniformity in the bankruptcy administration; (ii) reducing forum shopping and confusion; (iii) conservation of the debtors' and creditors' resources; (iv) expediting the bankruptcy process; (v) the right of the party to a jury trial; and (vi) whether the proceeding is core or non-core. *In re Quality Lease & Rental Holdings, LLC*, No. 14-60074, 2016 WL 416961, at *4 (Bankr. S.D. Tex. Feb. 1, 2016) (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985); *see In re Burger Boys, Inc.*, 94 F.3d 755, 762 (2d Cir. 1996). "The majority of courts evaluating a request to withdraw the reference place paramount importance on whether the claims at issue are core or non-core." *In re Quality Lease*, 2016 WL 416961, at *5.

**\*6** The crux of the issue before the Court, however, is whether subject matter jurisdiction exists under 28 U.S.C. § 1334.

### I. Absence of § 1334 Subject Matter Jurisdiction

It is undisputed that Ultra filed its counterclaim against Anadarko subsequent to the confirmation of its Plan of Reorganization. (*See* ECF No. 100 at 9 (indicating that Ultra's counterclaim was filed after the Court confirmed the Plan)). Ultra argues, however, that the date governing the Court's subject matter jurisdiction over the counterclaim is not the date the counterclaim was filed, but rather the date this adversary proceeding was filed, which occurred prior to confirmation of the Plan. (ECF No. 100 at 10).

Anadarko contests this assertion, arguing that Ultra's counterclaim is governed by the Fifth Circuit's narrow post-confirmation jurisdictional standard, which exists only for matters pertaining to the implementation or execution of a plan. (ECF No. 99 at 2). Anadarko maintains that unlike the Plaintiffs, it "did not commence any adversary proceeding regarding the SAA, did not seek to intervene in this adversary proceeding, did not file a proof of claim, and did not [otherwise] participate in the chapter 11 cases." (ECF No. 99 at 1). Consequently, Anadarko argues, the Court does not have subject matter jurisdiction over Ultra's counterclaim because it is a post-confirmation claim that will have no bearing on the implementation or execution of the Plan.

2019 WL 2524936

*a. Jurisdiction under 28 U.S.C. § 1334*

Section 1334 provides that district courts have subject matter jurisdiction over all "civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). With respect to bankruptcy cases that remain open, the Fifth Circuit has held that "it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under,' or 'related to a case under,' title 11." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987). The Fifth Circuit noted that § 1334(b)'s language operates "conjunctively to define the scope of jurisdiction." *Id.* Consequently, a bankruptcy court need only "determine whether a matter is at least 'related to' the bankruptcy." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999) (citing *In re Walker*, 51 F.3d 562, 569 (5th Cir. 1995); *In re Wood*, 825 F.2d at 93)). The test is "whether the outcome of the proceeding could conceivably have any effect on the estate being administered in the bankruptcy." *In re Wood*, 825 F.2d at 93; *see In re Forth Worth Osteopathic Hosp. Inc*, Nos. 4:07–CV–206–Y, 4:07–CV–457–Y, 4:07–CV–553–Y, 4:07–CV–624–Y, 2008 WL 2522528, at * 2 (N.D. Tex. June 25, 2008) ("For jurisdiction to attach, the anticipated outcome of the action must both (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate.").

However, the counterclaim against Anadarko was filed after confirmation and substantial consummation of Ultra's Plan of Reorganization. "After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *In re Craig's Stores of Texas, Inc.*, 225 F.3d 388, 390 (5th Cir. 2001). "[E]xpansive bankruptcy court jurisdiction required to facilitate 'administration of the debtor's estate' is not appropriate for matters that "comport[ ] more closely with the effect of a successful *reorganization*," rather than an effect on the debtor's estate. *Id.* at 390–391 (emphasis added). Post-confirmation "related to" bankruptcy jurisdiction is restricted to matters pertaining to implementation or execution of the reorganization plan. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, No. G-05-0012, H-01-3624, 2005 WL 1745471 at *4 (S.D. Tex. July 25, 2005) (citing *In re Craig's Stores*, 255 F.3d at 390).

**\*7** Ultra claims jurisdiction exists based on the relatedness between the Plaintiffs' complaint and its own counterclaim against Anadarko. There is no question, Ultra maintains, that the Court has subject matter jurisdiction over the

Plaintiffs' adversary complaint. (ECF No. 100 at 11). It is also undisputed that both the Plaintiffs' complaint and Ultra's counterclaim "arise under the exact same controversy." (ECF No. 100 at 11). Consequently, Ultra argues, the Court has "related to" jurisdiction over its counterclaim against Anadarko because the claim arises out of the same circumstances and raises the same questions as those posed by SCPPA and TID's pre-confirmation complaint. (ECF No. 100 at 12). In effect, "Ultra is simply trying to ensure that the entire dispute presented by SCPPA and TID's adversary proceeding is resolved at the same time, as efficiently as possible." (ECF No. 100 at 15).

It is well established that the mere existence of common facts and circumstances in a bankruptcy proceeding and a separate action does not create "related to" jurisdiction, nor can judicial economy suffice to exercise jurisdiction where the suit is otherwise unrelated to the bankruptcy proceeding." *In re Enron Corp. Securities*, 2005 WL 1745471 at *2. Ultra cannot use the "common facts and circumstances" between SCPPA and TID's pre-confirmation complaint and its counterclaim against Anadarko to bring the counterclaim under § 1334(b)'s "related to" jurisdiction. Under § 1334(b)'s broad jurisdictional standard, Ultra must show that the outcome of its counterclaims "could conceivably have any effect on the estate being administered in the bankruptcy." *In re Wood*, 825 F.2d at 93. Ultra's counterclaim was filed after there was no longer an estate to administer. Ultra cannot make the appropriate showing to establish jurisdiction under § 1334(b).

Ultra's argument further fails to specify what, if any, effect its counterclaim against Anadarko will have on the interpretation or execution of its Plan of Reorganization. *see In re Craig's Stores*, 266 F.3d at 391 (finding that in order to fall "within the bankruptcy court's post-confirmation jurisdiction" the claim must "bear on the interpretation or execution of the debtor's plan"). Although Ultra indicates that "SCPPA and TID's pre-confirmation complaint lands squarely within the statutory definition of a 'related to' proceeding under 28 U.S.C. § 1334(b) because of its impact on Ultra's rights, liabilities, options, or freedom of action," it fails to delineate how its counterclaim against Anadarko will bear upon the execution or interpretation of its Plan. (ECF No. 100 at 12). Ultra cannot rely on the similarities between the two causes of action to establish that its counterclaim against Anadarko invokes "related to" jurisdiction under the Fifth Circuit's narrow post-confirmation jurisdictional standard.

2019 WL 2524936

Subject matter jurisdiction under 28 U.S.C. § 1334 does not exist over Ultra's counterclaim against Anadarko. Anadarko's alternative arguments are rendered moot as a result of the Court's finding that no § 1334 subject matter jurisdiction exists over Ultra's counterclaim.

## II. The District Court Has Supplemental Jurisdiction under 28 U.S.C. § 1367

### a. Adversary Proceeding No. 17-03044

"In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Fifth Circuit has held, however, that even where a District Court "could reach a third-party claim under its supplemental jurisdiction, a bankruptcy court does not have supplemental jurisdiction to reach such claims." In re Walker, 51 F.3d 562, 570 (5th Cir. 1995). There is no indication under 28 U.S.C. § 157's jurisdictional grant that "district courts may refer to bankruptcy courts any cases that were before the district courts only on the basis of supplemental jurisdiction." Id. at 573. "[I]t would be somewhat incongruous to gut this careful system by allowing bankruptcy courts to exercise supplemental jurisdiction to pull into bankruptcy matters Congress excluded in its specific jurisdictional grants." Id. (citations omitted).

**\*8** The parties do not dispute that the District Court has subject matter jurisdiction over Ultra's counterclaim. (ECF No. 113 at 9, 24 ("[T]he district court could exercise jurisdiction under § 1367 [because] the claims that Ultra has brought against Anadarko ... have factual and legal overlap with the claims that undisputedly arise under Section 1334."); ECF No. 110 at 7 ("The District Court has [ ] original and supplemental jurisdiction required to hear all [ ] claims in this case.")).

Ultra maintains that the appropriate remedy where lack of subject matter jurisdiction exists, is a Report and Recommendation to the District Court to withdraw the reference as opposed to granting Anadarko's Motion to Dismiss. Ultra proposes two alternatives for the Court's Report and Recommendation. Ultra indicates that the Court should (i) withdraw the reference as to the third-party claim against Anadarko and allow the parties to litigate the rest of

the case in Bankruptcy Court; or, alternatively, (ii) withdraw the reference to the third-party claim against Anadarko and recommend that all pretrial matters including "ruling on the parties' numerous motions, remain in the Bankruptcy Court." (ECF No. 110 at 10; ECF No. 113 at 25).

Ultra's own arguments, however, contradict its first alternative. At the hearing on Anadarko's Motion to Dismiss, Ultra indicated that its principal goal is to have all working interest owners, who are bound by the SAA, "subject to the same judgment and in the same forum." (ECF No. 113 at 24). Ultra, in joining Anadarko as a third-party defendant and attempting to lift the stay to join Vanguard in the same manner, seeks to litigate the underlying dispute jointly with the parties at issue. Segregating the parties' claims between the Bankruptcy and District Courts would thwart Ultra's goal. (See ECF No. 100 at 6 ("The Court should decide this case as to all working interest owners in order to further the economy of time and resources."))

Furthermore, the absence of § 1334 subject matter jurisdiction over Ultra's counterclaim forecloses Ultra's second alternative. To support its proposition, that the District Court leave all pretrial matters with this Court, Ultra cites In re Osteopathic Hosp., 2008 WL 2522528, at * 3. (ECF No. 110 at 10). In In re Osteopathic Hosp., the district court allowed a "third-party action to remain with the bankruptcy court for the limited purpose of coordinating discovery and addressing all pretrial matters, including any dispositive motions." Id. at *5. The district court in that case, however, also concluded that the bankruptcy court "enjoy[ed] 'related to' jurisdiction because the bankruptcy judge [had previously] found that the third-party action could conceivably affect the administration of the Hospital's bankruptcy estate." Id. The facts of the issue before the Court are dissimilar. Here, the Court finds that § 1334 subject matter jurisdiction over Ultra's counterclaim does not exist at all. In light of the Fifth Circuit's finding that "bankruptcy courts may not exercise supplemental jurisdiction," it is questionable whether this Court's jurisdiction may reach even pre-trial motions regarding Ultra's claim against Anadarko. see In re Walker, 51 F.3d 562 at 571 (holding "the bankruptcy court could not exercise supplemental jurisdiction over [the party's] third-party claim"). The Court therefore recommends that the District Court withdraw the reference as to adversary proceeding No. 17-03044.

### b. Vanguard's Objection to Ultra's Claim in Case No. 17-30560

**\*9** Given that Vanguard's objection to Ultra's Proof of Claim relies on the same arguments as those in the adversary proceeding, the Court recommends that the District Court also withdraw the reference as to Vanguard's claim objection in case No. 17-30560. (Case No. 17-30560, ECF No. 1917). As outlined above, a "district court may withdraw, *in whole or in part,* any case or proceeding referred" under § 157 "on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d) (emphasis added). A district court may therefore withdraw the reference as to only a portion of a case. *see City of Clinton v. Pilgrim's Pride Corp.,* No. 4:09-CV-386-Y, 2009 WL 10684933 at * 2 (N.D. Tex. Aug. 18, 2009) (withdrawing the reference to an adversary proceeding, but allowing an issue pertaining to Bankr. P. 2019 to remain in the bankruptcy court); *see also Levine v. M.&A. Custom Home Builder & Developer, LLC,* 400 B.R. 200, 203 (S.D. Tex. 2008) (recommending a partial withdrawal of reference and requesting retention of pending and future pretrial dispositive motions); *In re Brown Medical Center, Inc.,* 578 B.R. 590 (Bankr. S.D. Tex. 2016) (recommending withdrawal of the reference as to the adversary proceeding but seeking to retain all pretrial matters pertaining to the same). Given that Vanguard's objection to Ultra's proof of claim is the only portion of case No. 17-30560 that pertains to the present dispute, only that claim objection (ECF No. 1917) should be withdrawn.

### Conclusion

For the reasons set forth above, the Court recommends that the District Court withdraw the reference as to (i) all of adversary proceeding No. 17-03044; and (ii) the claim objection set forth in ECF No. 1917 in case No. 17-30560.

### All Citations

Slip Copy, 2019 WL 2524936

---

Footnotes

1    The interpretation of this language is the subject of prior and current litigation.

2    Both Ultra and Vanguard are parties to "(a) an Operating Agreement dated June 18, 1997, (b) an Operating Agreement dated November 14, 1997, and (c) two Operating Agreement[s] dated October 25, 2001, each covering different leases (collectively the 'JOAs'). Each of the JOAs covers oil and gas leases in the Pinedale Field, Sublette County, Wyoming." (Case No. 17-30560, ECF No. 1065 at 2).

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Southwest Insulation, Inc. v. General Insulation Company, Not Reported in Fed. Supp....

Case 23-03208   Document 7   Filed in TXSB on 09/29/23   Page 39 of 43

2015 WL 13450817

2015 WL 13450817
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Fort Worth Division.

SOUTHWEST INSULATION, INC.
and Ronal L. Wright, Plaintiffs,

v.

GENERAL INSULATION
COMPANY, Defendant.

Civil Action No. 4:15–cv–601–O
|
Signed 11/23/2015

**Attorneys and Law Firms**

Daniel L. Bates, Jacob Leon Ramsey, Kyle Benjamin Fonville, Decker Jones McMackin McClane Hall & Bates PC, Fort Worth, TX, for Plaintiffs.

Buena Vista Lyons, Allyn J. Lowell, Ford & Harrison LLP, Victor D. Vital, Barnes & Thornburg LLP, Dallas, TX, for Defendant.

## ORDER

Reed O'Connor, UNITED STATES DISTRICT JUDGE

 **\*1** Before the Court are Defendant General Insulation Company's ("GIC") Motion to Dismiss (ECF No. 5), filed August 14, 2015; Plaintiffs Southwest Insulation, Inc. ("SWI") and Ronal L. Wright's ("Wright") (collectively, "Plaintiffs") Response to Defendant General Insulation Company's Motion to Dismiss Under Federal Rule 12(b)(6) and Brief in Support (ECF No. 8), filed September 4, 2015; and Defendant's Reply (ECF No. 13), filed September 18, 2015. Having considered the motion, related briefing, and applicable law, the Court concludes that the motion should be and is hereby **GRANTED in part and DENIED in part**.

## I. BACKGROUND

Plaintiffs filed this action in Texas state court alleging that Defendant breached a series of contracts between the parties and committed fraud by soliciting Plaintiffs to enter into said contracts with no intention of honoring its provisions.

Pet. ¶¶ 6.3–6.11. Specifically, Plaintiffs entered into an Asset Purchase Agreement, an Insulation Supply Agreement, and a Leasing agreement with GIC to supply insulation "materials at competitive market prices" to SWI, and GIC was supposed to pay the rent for the storage facilities to house the materials. Pet. ¶¶ 6.5–6.7. Under the terms of the Lease Agreement, GIC was obligated to pay Wright, the President of SWI, rent on the first day of each month during the term of the lease for 5 years as of January 1, 2013. Id. ¶ 6.6. Plaintiffs allege GIC stopped one of those rent payments. Id. ¶ 6.12. SWI also alleges that GIC increased the price of the insulation materials on at least two occasions in May 2013. Id. ¶ 6.8. This was repeated in 2014 and 2015, forcing SWI to realize that they no longer enjoyed a competitive market price from the Insulation Supply Agreement with GIC. Id. SWI alleges that during this time, from early 2013 until the first quarter of 2015, it was not competitive in the marketplace and was not awarded contracts because of the price increases. Id. ¶ 6.9.

Upon SWI notifying GIC of this, GIC allegedly lowered the price of its insulation materials, but not to the agreed level the contracts articulated when they were finalized in 2012. Id. ¶ 6.10. SWI claims that GIC then refused to credit SWI any excess charges, or credit the amounts towards recent and future purchases. Id. SWI alleges GIC also refused to honor its commitment to SWI altogether by refusing to supply SWI with insulation materials at all. Id. ¶ 6.11.

Plaintiffs filed this cause of action in the 342nd Judicial District of Tarrant County, Texas, Cause No. 342–279769–15, alleging that the Defendant engaged in breach of contract and fraud. Def.'s Notice Rem. 1, (ECF No. 1). Plaintiffs sought declaratory relief. Id. Defendant, a Massachusetts corporation, removed this action to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, before moving to dismiss Plaintiffs' claims. Def.'s Mot. Dismiss, ECF No. 5.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 23-03208   Document 7   Filed in TXSB on 09/29/23   Page 40 of 43

Southwest Insulation, Inc. v. General Insulation Company, Not Reported in Fed. Supp....

2015 WL 13450817

12(b)(6) for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6).

**\*2** To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations and internal quotation marks omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may also consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

## III. ANALYSIS

Defendant argues that Plaintiffs' (1) breach of contract claims are legally infirm; (2) declaratory relief claims are legally infirm; and (3) fraud claims are insufficiently pleaded. Def.'s Mot. Dismiss 4–7, ECF No. 5. The Court addresses each argument in turn.

### A. BREACH OF CONTRACT CLAIMS

Defendant states Plaintiffs' breach of contract claims provide Defendant with inadequate notice of what alleged conduct breached the agreements between the parties. *Id.* at 4–5. Specifically, according to GIC, though SWI's first breach of contract claim opines that GIC breached the Asset Purchase agreement to charge a "competitive market price," Plaintiffs never stated "what price Defendant charged, specify when Defendant charged it, or explain how this price differed from the alleged, unstable 'competitive market price,' which it conceded was not subject to a specific agreement." *Id.* Secondly, Defendant states that Plaintiffs' second breach of contract claim fails because they have not set forth facts supporting every element of the claim for breach of contract. *Id.*

The elements of a breach of contract action are: "(1) the existence of a valid contract; (2) performance or tender of performance; (3) breach by the defendant; and (4) damages resulting from the breach." *Goins v. City of Sansom Park*, 4:14–cv–365–O, 2015 WL 3960895 *at* \*1 (N.D. Tex. June 29, 2015) (O'Connor, J.) (citing *Oliphant Fin., LLC v. Galaviz*, 299 S.W.3d 829, 834 (Tex. App.—Dallas 2009, no pet.) (quoting *Hussong v. Schwan's Sales Enters., Inc.*, 896 S.W.2d 320, 326 (Tex. App.—Houston [1st Dist.] 1995, no writ)). The Court will analyze each agreement under the Texas breach of contract standard since diversity jurisdiction applies and the *Erie* Doctrine dictates the Court to apply Texas substantive state law. *National Liablity & Fire Ins. Co. v. R & R Marine, Inc.*, 756 F.3d 825, 834 (5th Cir. 2014) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

### 1. Breach of Supply Agreement

**\*3** Plaintiffs allege that they entered into an Asset Purchase Agreement which included a Supply Agreement for insulation on December 1, 2012. Pet. ¶ 6.5, ECF No. 1–1. GIC is alleged to have breached this agreement by failing to produce insulation supplies to SWI at "competitive market prices." Pet. ¶¶ 6.5–6.7. Plaintiffs allege GIC increased the price of the materials on "two occasions," and this increase resulted in a "greater than competitive market price," which contributed to SWI's failure to be competitive in the contractor bidding process and resulted in the company not receiving contracts. *Id.* ¶¶ 6.8–6.9. Plaintiffs then allege they "notified GIC that its prices were not competitive," and "GIC lowered the prices of insulation materials," but GIC "failed

**Southwest Insulation, Inc. v. General Insulation Company, Not Reported in Fed. Supp....**
Case 23-03208 Document 7 Filed in TXSB on 09/29/23 Page 41 of 43
2015 WL 13450817

and refused to credit SWI amounts charged in excess of competitive market prices." *Id.* ¶ 6.10. Plaintiffs claim to have suffered actual damages, including lost profits, as result of not having access to competitive market prices for insulation materials. *Id.* ¶ 7.13–7.14. Plaintiffs also allege that GIC "refused to supply SWI Insulation materials at all" after SWI confronted the company with its grievances. *Id.* ¶ 6.11. The Court finds that Plaintiffs have pleaded sufficient facts to show that Defendant breached the Asset Purchase and Supply Agreements by failing to offer SWI insulation at "competitive market prices."

Plaintiffs' pleading alleges sufficient facts to show Defendant breached the Supply Agreement. *Sonnier*, 509 F.3d at 675. Accordingly, Defendant's motion to dismiss as to Plaintiffs' breach of contract claim for the Asset Purchase Agreement that included the Supply Agreement is hereby **DENIED.**

### 2. Breach of Lease Agreement

On the breach of Lease Agreement claim, Defendant states that Plaintiffs have not provided Defendant with "fair notice" of the facts of its offending conduct, and Plaintiffs did not plead "facts demonstrating that they performed under the agreement, or that Defendant's alleged breach damaged them." Def.'s Reply 4, ECF No. 13. Plaintiff counters that GIC breached the Lease Agreement by stopping payment on a check sent to Ronal L. Wright, due on July 1, 2015. Pet. ¶¶ 6.12–6.13, 7.3, ECF No. 1–1. Here, Plaintiff alleges it entered into an agreement to lease approximately 11,000 square feet of commercial space in a Fort Worth, Texas warehouse to house the insulation it obtained from the Asset Purchase and Supply Agreements for five years. *Id.* ¶¶ 6.3, 6.6. This period was set to begin on January 1, 2013, and end on December 31, 2017. *Id.* The purposes of this Lease Agreement was part of a two-pronged approach to lower the net material costs of SWI acquiring insulation from GIC by "eliminat[ing] insulation material warehousing and job site delivery" concerns for SWI. *Id.* ¶ 6.3. Plaintiffs allege GIC was supposed to pay Ronal L. Wright, the president of SWI and the Landlord of the Lease Agreement, rent on the first day of each month throughout the term of the lease without any "set-off, recoupment or reduction." *Id.* ¶ 6.7. On July 9, 2015, after GIC's missed payment, Wright allegedly sent notice of GIC's failure to pay rent pursuant to the Lease Agreement, and Wright cautioned that default could be likely if the deficiency was not cured. *Id.* ¶ 6.13. In its response, Plaintiffs also contend that fair notice was provided to Defendant because

stopping the payment was a breach of the Lease Agreement, as evidenced by paragraphs 6.12–6.13 in their Petition. Pls.' Resp. ¶ 6.3, ECF No. 8. This information was enough to put Defendant on notice as to Plaintiffs' claims for breach of the Lease Agreement. When viewed in the light most favorable to Plaintiffs' well-plead facts, the Court finds that Plaintiffs have alleged sufficient facts to survive Defendant's motion to dismiss.

Accordingly Defendant's motion to dismiss as to Plaintiffs' breach of contract claims for the Lease Agreement is hereby **DENIED.**

### B. PLAINTIFFS' REQUEST FOR DECLARATORY JUDGMENT

Defendant pleads that Plaintiffs' claims for declaratory relief should be dismissed because they fail to provide Defendant with adequate notice of what alleged conduct breached the agreements between the parties. Def.'s Mot. Dismiss 4, ECF No. 5. Plaintiff does not provide a direct response to these claims, only stating "the facts pleaded by SWI more than support the request for declaratory relief SWI requests." Pl.'s Resp. 3, ECF No. 8. The Court finds Plaintiffs have not pleaded sufficient facts to warrant declaratory relief. "An action for declaratory judgment is remedial in nature; and its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and legal relations." Tex. Civ. Prac. & Rem. Code § 37.002. Under Texas law, a declaratory judgment is only appropriate if "(1) a justiciable controversy exists as to the rights and status of the parties; and (2) the controversy will be resolved by the declaration sought." *Grace v. Everhome Mortgage Co.*, No. 3:13–CV– 4563–B, 2015 WL 5146678, at *6 (N.D. Tex. Sept. 2, 2015) (Boyle, J.) (quoting *Park Cities Ltd. P'ship v. Transpo Funding Corp.*, 131 S.W.3d 654, 661 (Tex. App.—Dallas 2004, pet. denied)). "A declaratory judgment action is not appropriate where plaintiff's cause of action is mature and enforceable in a pending suit that involves the same parties and the same issues as alleged in the declaratory judgment action." *Grace*, 2015 WL 5146678 * 6 (*citing Tucker v. Graham*, 878 S.W.2d 681, 683 (Tex. App.—Eastland 1994, no writ); *accord Southern Traffic Bureau v. Thompson*, 232 S.W.2d 742 (Tex. Civ. App.—San Antonio 1950, *writ ref'd n.r.e.*); *see also SpawGlass Const. Corp. v. City of Hous.*, 974 S.W.2d 876, 878 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (holding that a court may deny a request for declaratory relief where judgment would not remove the uncertainty giving rise to the proceedings). It would not be appropriate for the Court to grant a declaratory judgment in this case because

Case 23-03208   Document 7   Filed in TXSB on 09/29/23   Page 42 of 43

Southwest Insulation, Inc. v. General Insulation Company, Not Reported in Fed. Supp....

2015 WL 13450817

such a judgment would not provide Plaintiffs any relief which could not be obtained in an action for damages, such as those brought above for breach of contract. Defendant's motion to dismiss is hereby **GRANTED** as to Plaintiffs' claims for declaratory relief.

### C. FRAUD CLAIM

**\*4** Defendant declares that Plaintiffs have not satisfied their heightened pleading standard to plead a fraud claim with sufficient specificity. Mot. Dismiss 5, ECF No. 5. Even if Plaintiffs prove they have met their burden to plead specific facts to allege fraud, according to the Defendant, Plaintiffs' fraud claim fails because all damages they attribute to the alleged fraud are subsumed in their breach of contract claims because of the economic loss rule. *Id.* at 6. The Court analyzes the elements of fraud under Texas law. *Hermann Holdings Ltd. v. Lucent Technologies Inc.*, 302 F.3d 552, 558 (5th Cir. 2002) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 79–80 (1938)).

Under Texas law, Plaintiffs must allege facts sufficient to show that: "(1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation[,] the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff injury." *Gipson v. Deutsche Bank Nat. Trust Co.*, No. 3:13–CV–4820–L, 2015 WL 2079514, at \*8 (N.D. Tex. May 4, 2015) (Lindsey, J.) (quoting *YinguangChem. Indus. Joint Stock Co. Ltd., v. Potter*, 607 F.3d 1029, 1032–33 (5th Cir. 2010) (citing *Ernst & Young L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)). Plaintiffs must also meet the heightened fraud pleading standard, a procedural hurdle under Federal Rule of Civil Procedure 9(b). The heightened pleading standard for allegations of fraud requires a plaintiff to plead "with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the particularity standard of Rule 9(b), a plaintiff generally must "plead the time, place, and contents of the false representation and the identity of the person making the representation." *United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 260 (5th Cir. 2014) (citing *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). The Fifth Circuit interprets Rule 9(b) strictly, "requiring a plaintiff

pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *Herrmann Holdings*, 302 F.3d at 564–65)). The particularity standard requires, at a minimum, "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/ HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). While a plaintiff may allege fraud based upon information and belief in instances where the "facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief." *Id.* at 454.

Plaintiffs fail to plead sufficient facts in their original petition to survive Defendant's motion to dismiss because they do not plead enough information pertaining to "who, what, when, where, and how" GIC's alleged fraud occurred. *United States ex rel. Williams*, 417 F.3d at 453. Though Plaintiff states that GIC made representations that it would offer "competitive market prices for insulation materials and products" and the supply agreement and lease agreement were entered into "for the purpose of having SWI rely upon it and in fact, SWI did rely upon this representation," Plaintiff makes no other charges as to its fraud claim. Pet. ¶¶ 7.4–7.5, ECF No. 1–1; Pls.' Resp. 3, ECF No. 8. True, Plaintiffs point to several written agreements which "memorialized this arrangement," but although Plaintiffs list the date of these agreements, this information still fails to address who affirmed the contracts and agreed to offer a competitive market price, where these negotiations took place, and how GIC either "knew the representation [to honor these agreements were] false when made or that [GIC] had no intent of actually performing on that promise." Pet. ¶ 7.5, ECF No 1–1. Because the Court finds that Plaintiffs have not alleged sufficient facts to meet its heightened burden to plead fraud, it need not address Defendant's economic loss rule under Texas law. Mot. Dismiss 6, ECF No. 5. Accordingly Defendant's motion to dismiss as to Plaintiffs' fraud claim is hereby **GRANTED.**

### D. LEAVE TO AMEND

**\*5** The Court finds that Plaintiffs are entitled to amend their petition to address any pleading deficiencies. Plaintiffs request leave to amend any claims and re-plead any facts to meet its burden should the Court grant GIC's motion to dismiss. Pls.' Resp. 3, ECF No. 8. "If it appears that a more

Southwest Insulation, Inc. v. General Insulation Company, Not Reported in Fed. Supp....

2015 WL 13450817

carefully drafted pleading might state a claim upon which relief could be granted, the court should give the claimant an opportunity to amend his claim rather than dismiss it." *Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp. 2d 601, 608–09 (N.D. Tex. 2006) (Fish, C.J.) (citing *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir.1985); *accord Taylor v. Dallas Cty Hosp. Dist.*, 976 F. Supp. 437, 438 (N.D. Tex. 1996) (Fish, J.). Likewise, "leave to amend a pleading should be freely given and should be granted unless there is some justification for refusal." *Kennard*, 420 F. Supp. at 609 (quoting *United Sates ex rel Willard v. Humana Health Plan of Texas*, 336 F.3d at 375, 386 (5th Cir 2003)). There is no reason to refuse Plaintiffs' request for here. In light of this, the Court **GRANTS** Plaintiffs leave to re-plead their declaratory judgment and fraud claims by **December 5, 2015**. Should Plaintiffs fail to file an amended complaint by this date, the Court will dismiss Plaintiffs' declaratory judgment and fraud claims with prejudice.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Under Federal Rule 12(b)(6) is hereby **GRANTED in part and DENIED in part**. Defendant's Motion is **GRANTED** for Plaintiffs' declaratory relief and fraud claims, but **DENIED** as to Plaintiffs' claims for breach of contract. Plaintiffs may re-plead by the **5th day** of **December, 2015**, or their declaratory judgment and fraud claims will be dismissed with prejudice.

**SO ORDERED** on this **23rd day** of **November, 2015.**

## All Citations

Not Reported in Fed. Supp., 2015 WL 13450817

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.