IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | CHAPTER 11 |
| | § | |
| BASIC ENERGY SERVICES, INC., *et al.*, | § | Case No. 21-90002 (CML) |
| | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| _____ | § | |
| PPC ENERGY, LP and PRIEST | § | |
| PETROLEUM CORPORATION, | § | |
| | § | |
| | § | |
| Plaintiffs and Counter-Defendants, | § | Adversary No. 23-03208 |
| | § | |
| vs. | § | |
| | § | |
| SELECT ENERGY SERVICES, LLC, | § | |
| | § | |
| Defendant and Counter-Plaintiff. | § | |

**PLAINTIFFS' OBJECTION TO DEFENDANT'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT [ADV. DKT. 40]</u>**

## <u>TABLE OF CONTENTS</u>

SUMMARY OF THE ARGUMENT ........................................................................................... 1

SUMMARY JUDGMENT EVIDENCE ................................................................................... 2

UNDISPUTED FACTS ............................................................................................................ 2

LEGAL STANDARD ............................................................................................................... 4

ARGUMENT AND AUTHORITIES ...................................................................................... 5

    I.    THE FINAL JUDGMENT IS AN "ASSUMED LIABILITY"
        AS A MATTER OF LAW. ....................................................................................... 5

        A.  There are no substantive differences between PPC's ordinary
            negligence and negligence per se claims. .................................................... 5

        B.  Negligent waste arises under "Environmental Law." ................................... 8

        C.  The Texas Natural Resources Code is an "Environmental Law." ................. 10

        D.  The Final Judgment is itself an "Environmental Law." ................................ 12

        E.  The Final Judgment is a "Liability" arising with respect to
            "Environmental Claims" related to the injection of produced water. ............ 13

   II.   THE DISCLOSURE SCHEDULES TO THE APA DO NOT EXPRESS AN
       OBJECTIVE INTENT BY THE CONTRACTING PARTIES TO SHIELD
       SELECT FROM ASSUMING LIABILITY FOR THE FINAL JUDGMENT. ................ 14

  III.  PLAINTIFFS' ACTIONS BEFORE AND AFTER ENTRY OF THE
       LIFT STAY ORDER ARE CONSISTENT WITH SELECT'S AGREEMENT
       UNDER THE APA TO ASSUME LIABILITY FOR THE FINAL JUDGMENT........... 18

  IV.  SELECT IS NOT ENTITLED TO A PARTIAL SUMMARY JUDGMENT.................... 23

CONCLUSION AND PRAYER ............................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                           **Page(s)**

*In re Am. Coastal Energy*,
    399 B.R. 805 (S.D. Tex. Bank. 2009)..........................................................................11, 13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................................................4

*In re Applewood Chair Co.*,
    203 F.3d 914 (5th Cir. 2000) ...............................................................................23

*Aviles v. Aguirre*,
    292 S.W.3d 648 (Tex. 2009)................................................................................19

*CL III Funding Holding Co., LLC v. Steelhead Midstream Partners, LLC*,
    655 S.W.3d 844 (Tex. App.—Fort Worth 2022, no pet.)..................................18, 21

*Key Operating & Equip., Inc. v. Hegar*,
    435 S.W.3d 794, 798 (Tex. 2014) ........................................................................11

*ConocoPhillips Co. v. Koopmann*,
    547 S.W.3d 858, 874 (Tex. 2018) ..........................................................................4

*Discovery Operating, Inc. v. BP Am. Prod. Co.*,
    311 S.W.3d 140 (Tex. App.—Eastland 2010, no pet.) ..........................................7

*Matter of Edgeworth*,
    993 F.2d 51 (5th Cir. 1993) .................................................................................21

*Elliff v. Texon Drilling Co.*,
    210 S.W.2d 558 (Tex. 1948).................................................................................8

*In re Essex Ins. Co.*,
    450 S.W.3d 524 (Tex. 2014)................................................................................18

*Evanston Ins. Co. v. AmSpec Holding Corp.*,
    495 F. Supp. 3d 485 (S.D. Tex. 2020) ..................................................................4

*Galin Corp. v. MCI Telecom. Corp.*,
    No. CIV. A. H-88-4131, 1992 WL 560909 (S.D. Tex. July 21, 1992), *aff'd*, 12
    F.3d 465 (5th Cir. 1994) .......................................................................................4

*Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*,
    995 S.W.2d 661 (Tex. 1999)................................................................................8

*In re Kellogg Brown & Root, Inc.*,
166 S.W.3d 732 (Tex. 2005) ...................................................................................17

*Key Operating & Equip., Inc. v. Hegar*,
435 S.W.3d 794, 798 (Tex. 2014) ..........................................................................11

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) .....................................................................................4

*Lumar Marine, Inc. v. Ins. Co. of N. Am.*,
910 F.2d 1267 (5th Cir. 1990) .................................................................................18

*Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*,
474 U.S. 494 (1986) .................................................................................................13

*Mohammagi v. Albertsons, LLC*,
656 S.W.3d 851 (Tex. App.—Houston [14th Dist.] 2022, pet. filed) .......................6

*In re Moose Oil & Gas Co.*,
347 B.R. 868 (Bankr. S.D. Tex. 2006) ....................................................................18

*Perry v. S.N.*,
973 S.W.2d 301 (Tex. 1998) ......................................................................................7

*S. Pacific Co. v. Castro*,
493 S.W.2d 491 (Tex. 1973) ......................................................................................7

*Tex. Dept. of Human Servs. v. E.B.*,
802 S.W.2d 647 (Tex. 1990) ......................................................................................6

*URI, Inc. v. Kleberg Cty.*,
543 S.W.3d 755 (Tex. 2018) ....................................................................................14

*Zamora v. Wells Fargo Bank, N.A.*,
No. H-19-3966, 2020 WL 4708153 (S.D. Tex. Aug. 13, 2020) ..............................23

**Statutes**

11 U.S.C. § 362 ...............................................................................................................3, 22

Fed. R. Civ. P. 56(a) ............................................................................................................4

Fed. R. Civ. P. 56(f) .......................................................................................................1, 23

Tex. Nat. Res. Code Ann. § 85 .....................................................................................11, 12

Tex. Nat. Res. Code Ann. § 85.045 ............................................................................*passim*

Tex. Nat. Res. Code Ann. § 85.046 ............................................................................*passim*

Tex. Nat. Res. Code Ann. § 85.201 ............................................................................12

Tex. Nat. Res. Code Ann. § 89.001 ............................................................................11

Tex. R. Civ. P. 277 ........................................................................................................6

Tex. R. Civ. P. 278 ........................................................................................................6

**Other Authorities**

*Natural Resource*, Black's Law Dictionary (11th ed. 2019) ............................................10, 11

Texas Pattern Jury Charges – General Negligence, Intentional Personal Torts &
   Workers' Compensation § 5.1 (2018) ....................................................................7

TO THE HONORABLE JUDGE CHRISTOPHER M. LOPEZ:

PPC Energy, LP and Priest Petroleum Corporation (collectively, "PPC") submit this *Objection to Defendant's Motion for Partial Summary Judgment [Adv. Dkt. 40]* (the "Objection") and respectfully show the Court as follows:

## SUMMARY OF THE ARGUMENT

The issue before the Court is whether Defendant Select Energy Services, LLC n/k/a Select Water Solutions, LLC ("Select") assumed liability to pay a final judgment entered in favor of PPC against Basic Energy Services, Inc. ("Basic"). The final judgment concerns Basic's injection of produced saltwater into the Orla Kessler disposal well. Basic's injections drowned the subsurface strata from which PPC's wells produced oil and gas, resulting in the displacement, waste, and underground loss of PPC's oil and gas reserves. Select previously filed a motion to dismiss PPC's claims, arguing the final judgment against Basic "is not an 'Assumed Liability' under the APA or Sale Order" as a matter of law. [Adv. Dkt. 5, p. 2–3]. However, after full briefing and oral argument, the Court denied the motion. [Adv. Dkt. 31].

Select seeks partial summary judgment on the same grounds previously argued in its motion to dismiss. [Adv. Dkt. 40, p. 7 ("Plaintiffs' judgment against Basic is not an 'Assumed Liability' of Select as a matter of law under the unambiguous text of the APA.")]. Select's new arguments are no more meritorious than the arguments advanced in support of its motion to dismiss and should likewise be rejected.

In short, Select unambiguously assumed, through the plain text of the Asset Purchase Agreement ("APA") and Assumption Agreement, "all Liabilities" arising under "Environmental Laws"—including the Texas Natural Resources Code—whether arising before, during, or after the filing of Basic's chapter 11 bankruptcy. Accordingly, the Court should deny Select's motion for partial summary judgment; use its discretion under Federal Rule of Civil Procedure 56(f) to grant

summary judgment in favor of PPC and against Select (or otherwise permissibly abstain from deciding any issues in this case); and remand the case back to state court.

## SUMMARY JUDGMENT EVIDENCE

In support of this *Objection*, PPC relies on the pleadings and papers on file with the Court and requests that the Court take judicial notice of the same. Additionally, PPC incorporates by reference and relies upon the exhibits in the *Appendix* filed in connection with *Plaintiffs' Brief in Response to Order Requesting Briefing* [Adv. Dkt. 39-1].

## UNDISPUTED FACTS

The relevant facts of this case are not disputed.  In short:

- On January 9, 2020, PPC sued Basic in the 143rd District Court in Reeves County, Texas (Cause No. 20-01-23355-CVR) (the "Reeves County Litigation"), alleging Basic's commercial disposal of produced saltwater into the Orla Kessler displaced the oil and gas in the subsurface strata from which PPC's oil and gas wells produced.  PPC alleged Basic's actions resulted in waste of oil and gas, which is prohibited by the Texas Natural Resources Code.  [Adv. Dkt. 39-7, APPX000244 at ¶¶ 17–18].

- On August 17, 2021, while the Reeves County Litigation was ongoing, Basic filed for bankruptcy.  [Main Dkt. 1].[1]

- That same day, Basic and Select executed the APA by which Select agreed to purchase certain assets, including the Orla Kessler disposal well, in exchange for

---

[1] Out of an abundance of caution, counsel for Plaintiffs discloses that she recently learned a law clerk who is now clerking for Judge Lopez and Judge Isgur formerly worked with Debtors' counsel in the main case related to this adversary proceeding on plan-related issues – *Basic Energy Services, Inc. See, e.g.*, ECF 1459, p. 11.

cash and the assumption of "all Assumed Liabilities." [Adv. Dkt. 39-2, APPX000013].

- Among the "Assumed Liabilities," Select expressly agreed to assume "all Liabilities . . . arising under Environmental Law, including with respect to Environmental Claims whether arising on, before, or after the Closing Date, including without limitation those related to . . . produced water . . . ." [*Id*. at APPX000079]. "Environmental Law" is expressly defined as "any Applicable Law . . . relating to the . . . protection of natural resources." [*Id*. at APPX000082].

- Select also covenanted to pay the "Assumed Liabilities," and to satisfy and discharge them, "if, as, when and to the extent due" from Basic. [Adv. Dkt. 39-4, APPX000187].

- On September 16, 2021, the Court approved the APA, expressly ordering that Select's purchase of the assets, including the Orla Kessler disposal well, was free and clear of the "Liens, Claims, and Interests (***other than Assumed Liabilities***, Permitted Liens, and as otherwise provided in the APA) . . . ." [Adv. Dkt. 39-5, APPX0000212 (emphasis added)].

- On October 1, 2021, Basic and Select (with the Court's approval) executed the Assumption Agreement, through which Select formally covenanted to pay, perform, and discharge the "Assumed Liabilities" defined in the APA. [Adv. Dkt. 39-4, APPX000187–88].

- On October 14, 2021, the Court modified the automatic stay pursuant to Section 362 of the Bankruptcy Code to permit PPC to prosecute the Reeves County Litigation to final judgment on the condition that Basic would not be obligated to

pay any amounts owed or awarded in connection therewith.   [Adv. Dkt. 39-6, APPX000235; *see also* Main Dkt. 1698, ¶¶ 2–3].

- On May 12, 2023, the Honorable Mike Swanson, presiding judge of the 143rd District Court, signed a final judgment in the Reeves County Litigation, awarding PPC $10,665,000 in actual damages against Basic, plus additional relief as set forth therein (the "Final Judgment"). [Adv. Dkt. 39-8, APPX000251–52].

## LEGAL STANDARD

A party moving for summary judgment under Rule 56(a) must demonstrate the absence of a genuine issue of material fact.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the non-movant's response.  *Id.*  Moreover, all of the facts and evidence must be viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

And where, as here, the issue is the construction of an unambiguous contract, the court may construe the writing as a matter of law.  *Evanston Ins. Co. v. AmSpec Holding Corp.*, 495 F. Supp. 3d 485, 491 (S.D. Tex. 2020) ("What a contract means, and whether a contract is ambiguous, are questions of law for the Court.").  Accordingly, an unambiguous contract should be construed according to the plain meaning of its express wording.  *Id.* (citing *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018)).  In other words, unambiguous contracts are enforced as written because it is the trial court's duty to ascertain the true intentions of the parties as expressed in the instrument in question.  *Id.*; *Galin Corp. v. MCI Telecom. Corp.*, No. CIV. A. H-88-4131, 1992 WL 560909, at \*6 (S.D. Tex. July 21, 1992), *aff'd*, 12 F.3d 465 (5th Cir. 1994).

## ARGUMENT AND AUTHORITIES

All of Select's summary-judgment arguments share a common thread—each of them would have this Court rewrite the APA and Assumption Agreement to say something they do not. Because the Court is duty-bound to enforce the agreements as written, Select's motion for partial summary judgment should be denied and, instead, summary judgment should be entered in PPC's favor.

## I.     THE FINAL JUDGMENT IS AN "ASSUMED LIABILITY" AS A MATTER OF LAW.

The answer to the Court's question regarding whether the Final Judgment is an "Assumed Liability" under the APA starts and ends with the text. Because the text "reigns supreme," each of Select's arguments fail as a matter of law.

### A.     There are no substantive differences between PPC's ordinary negligence and negligence per se claims.

Select contends it did not assume liability to pay the Final Judgment unless the Final Judgment arises under "Environmental Law." [Adv. Dkt. 40, p. 7]. Here, PPC pleaded and proved that Basic's conduct—which caused the drowning of subsurface strata and waste of PPC's oil and gas reserves—violated both the negligence per se and ordinary negligence standards of conduct. Thus, Basic's liability "aris[es] under" Environmental Law because both the statutory basis for Basic's liability (*i.e.*, waste prohibited by the Texas Natural Resources Code) and the common law basis for Basic's liability (*i.e.*, Basic's failure to exercise ordinary care to refrain from causing waste) are "Applicable Law[s] . . . relating to . . . protection of natural resources." [Adv. Dkt. 39-2, APPX000081–82].

Select's argument that there is a substantive difference under the APA between PPC's statutory claim for negligence per se under the Texas Natural Resources Code and its common-law claim for ordinary negligence is demonstrably false. [Adv. Dkt. 40, pp. 8–14]. PPC not only alleged but proved a single, unified basis for liability under both legal theories—that Basic's

actions caused waste of natural resources.  That both legal theories required the same factual finding by the jury is demonstrated by the trial court's submission of both theories jointly in a single broad-form question—which Texas courts are required to do where multiple legal theories necessitate the same factual finding.  *Tex. Dept. of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Mohammagi v. Albertsons, LLC*, 656 S.W.3d 851, 858 (Tex. App.—Houston [14th Dist.] 2022, pet. filed) ("Generally, broad form jury submissions are required whenever feasible."); TEX. R. CIV. P. 277 (in "all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions.").

Significantly, Select does not contest that the only breach of duty pleaded and proven by PPC in the Reeves County Litigation (whether through negligence per se or ordinary negligence) was that Basic caused "injected water to enter, drown, and pressurize the producing stratum or formations from which Plaintiffs' wells produce."  [Adv. Dkt. 39-7, APPX000242–43 at ¶¶ 11–14].  Basic's breach is both a violation of the Texas Natural Resources Code and the common law negligence standard.  *See* TEX. NAT. RES. CODE ANN. §§ 85.045 (prohibiting waste), 85.046 (defining "waste" as "drowning with water a stratum or part of a stratum that is capable of producing oil or gas or both in paying quantities" and "underground waste or loss, however caused").

Under Texas law, only questions which are raised by the written pleadings and evidence are properly submitted to the jury.  TEX. R. CIV. P. 278.  Thus, the common-law negligence question was not submitted on any basis other than Basic's waste-causing conduct in violation of the standard of care; any other basis would lack support in the pleadings and proof adduced at trial.  Moreover, it is improper to speculate at the summary-judgment stage, without any basis in the

evidentiary record, that the trial court erred by submitting an ordinary negligence question based on a legal or factual theory not found in the pleadings.

Because the negligence and negligence per se theories were based on the same operative facts regarding Basic's waste-causing conduct and required the same factual finding from the jury, the trial court properly submitted the negligence and negligence per se questions in a single, broad-form question. *Discovery Operating, Inc. v. BP Am. Prod. Co.*, 311 S.W.3d 140, 146 (Tex. App.—Eastland 2010, no pet.) (holding negligence per se claim for waste "inextricably intertwined" with claims for negligence, common law waste, and statutory waste).

Negligence per se is the unexcused violation of a legislative enactment or administrative regulation adopted by the court as defining the standard of conduct of a reasonable person. *Perry v. S.N.*, 973 S.W.2d 301, 304 n.4 (Tex. 1998); *S. Pacific Co. v. Castro*, 493 S.W.2d 491, 497 (Tex. 1973). Therefore, to properly submit an issue of negligence per se, a trial court simply instructs the jury that the prohibited conduct is negligence itself. *See* Texas Pattern Jury Charges – General Negligence, Intentional Personal Torts & Workers' Compensation § 5.1 (2018). In fact, when instructing courts on negligence per se, the Pattern Jury Charge provides the following guidance:

> PJC 5.1 should be given *if there are claims of both common-law negligence and negligence per se*. It includes both *an instruction, which should be placed immediately after the definition of 'negligence,'* and a broad-form question *jointly submitting negligence and proximate cause*.

*See* Comment, PJC 5.1 (emphasis added). This is exactly what the trial court did in the Reeves County Litigation when charging the jury. [Adv. Dkt. 39-8, at APPX000257].

Select speculates at length that, based on the charge submitted, the jury could have found a "failure to exercise ordinary care" without finding waste of natural resources. [Adv. Dkt. 40, p. 9]. Select's speculation that the jury could have found ordinary negligence on some basis other

than that pleaded by PPC and proven at trial is exactly that—unsubstantiated speculation that falls far short of the summary-judgment standard.

Likewise, Select's arguments that the Reeves County district court rejected Plaintiffs' claims for statutory waste, common law waste, and declaratory relief are untenable. Again, Texas courts are discouraged from submitting "differently worded questions that call for the same factual finding." *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 665–66 (Tex. 1999) ("While trial courts should obtain fact findings on all theories pleaded and supported by evidence, a trial court is not required to, and should not, confuse the jury by submitting differently worded questions that call for the same factual finding."). And, the factual findings for statutory waste and common law waste mirror those required for negligence and negligence per se.

For example, and as Select admitted in prior briefing, Plaintiffs' claim for statutory waste was premised on the same violation of the Texas Natural Resources Code on which Plaintiffs' claim for negligence per se was based. [Adv. Dkt. 5, p. 7; Adv. Dkt. 39-7, APPX000243 at ¶ 14 (negligence per se allegations), APPX000244 at ¶ 18 (common law and statutory waste allegations)]. Far from "rejecting" Plaintiffs' claims for negligence per se, common law waste, and statutory waste, the trial court simply submitted a single question on multiple legal theories that involved the same factual finding as required by Texas law. *See Hyundai*, 995 S.W.2d at 665–66; *compare Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 583 (Tex. 1948) (describing common law waste in Texas as "the negligent waste and destruction of" oil and gas) *with* Tex. Nat. Res. Code Ann. § 85.045 (prohibiting "waste"). Such submission was proper under Texas law.

## B.    Negligent waste arises under "Environmental Law."

The definition of "Environmental Law" includes "any Applicable Law" relating to the "protection of natural resources[.]" [Adv. Dkt. 39-2, APPX000082]. The definition of "Applicable Law" includes "any federal, state, or local law (***statutory, common or otherwise***)." [*Id.* at

APPX000078 (emphasis added)].  In other words, common law negligence is an "Environmental

Law" under the APA where the standard of care protects natural resources.

Notwithstanding, Select contends common law negligence is "carved out" of the definition

of "Environmental Law" per the highlighted clause below:

> "Environmental Law" means any Applicable Law or any binding agreement with any
> Governmental Authority relating to the protection of occupational or human health and safety (to
> the extent relating to exposure to Hazardous Substances), the environment (including ambient air,
> soil, surface water or groundwater, or subsurface strata), protection of natural resources,
> endangered, threatened or candidate species, biological or cultural resources, the release into the
> indoor or outdoor environment of pollutants, contaminants, wastes, chemicals, or toxic or other
> hazardous substances (or the cleanup thereof) or concerning the exposure to, or the generation,
> storage, transportation, disposal, Release or remediation of any Hazardous Substances.  The term
> "Environmental Laws" does not include good or desirable operating practices or standards that
> may be employed or adopted by other salt water disposal well operators or recommended, but not
> required, by a Governmental Authority.

[Id. at APPX000082].  There is no summary-judgment evidence showing the negligence found by

the jury resulted from the mere failure to use "good or desirable operating practices."  If the parties

had intended to categorically exclude common law negligence from "Environmental Law," they

could have easily done so by omitting common law claims, as a class, from the definition of

"Applicable Law" or expressly stating that "Environmental Law" excludes common law

negligence.[2]  They did neither.  The Court should reject Select's invitation to rewrite the APA.

Moreover, the so-called "carve out" is itself subject to an exception for "operating practices

or standards" that are "required" by a Governmental Authority (e.g., the State of Texas).  [Id.].

And here, the only breach of operating practices or standards alleged by PPC and proven at trial

was that Basic allowed produced water to drown the subsurface strata from which PPC's wells

produced oil and gas.  The duty to refrain from drowning with water a subsurface strata from which

---

[2] Indeed, the parties elsewhere employed the term "Negligence" in the APA where intended.  [See,
e.g., id. at APPX000070].

oil and gas is produced is not merely a good or desirable operating practice or standard that may

be employed or adopted by other saltwater disposal well operators—***it is a duty expressly required

by statute***.  TEX. NAT. RES. CODE ANN. §§ 85.045, 85.046.  Because the operating practice or

standard (*i.e.*, not drowning a productive subsurface formation with produced saltwater) is required

by statute, the so-called "carve out" upon which Select relies does not apply.

### C.    The Texas Natural Resources Code is an "Environmental Law."

The Texas Natural Resources Code is an "Environmental Law" as Select and Basic defined

that term in the APA:

> "Environmental Law" means any Applicable Law or any binding agreement with any
> Governmental Authority relating to the protection of occupational or human health and safety (to
> the extent relating to exposure to Hazardous Substances), the environment (including ambient air,
> soil, surface water or groundwater, or subsurface strata), protection of natural resources,
> endangered, threatened or candidate species, biological or cultural resources, the release into the
> indoor or outdoor environment of pollutants, contaminants, wastes, chemicals, or toxic or other
> hazardous substances (or the cleanup thereof) or concerning the exposure to, or the generation,
> storage, transportation, disposal, Release or remediation of any Hazardous Substances.  The term
> "Environmental Laws" does not include good or desirable operating practices or standards that
> may be employed or adopted by other salt water disposal well operators or recommended, but not
> required, by a Governmental Authority.

[Adv. Dkt. 39-2, APPX000082].

Select would have this Court hold that the Texas Natural Resources Code—which prohibits

the waste of oil and gas—does not protect natural resources.  Black's Law Dictionary defines

"natural resource" as "[a]ny material from nature having potential economic value or providing

for the sustenance of life, such as timber, minerals, ***oil***, water, and wildlife."  *Natural Resource*,

BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).  Among other things, the Texas

Natural Resources Code protects natural resources (*i.e.*, oil and gas) by prohibiting the "waste or

loss" of oil and gas.  *See* TEX. NAT. RES. CODE ANN. §§ 85.045, 85.046.

Select contends the statutory protection of oil and gas does not make the Texas Natural Resources Code an "Environmental Law" (despite the unambiguous language in the definition set forth in the APA) because the motive for doing so is "economic" and not genuine concern for the "environment." Select's argument is nonsensical for at least two reasons.

**First**, the APA's definition of "Environmental Law" does not require any specific legislative intent, and the Court should not rewrite the agreement to add a condition that does not exist. Under the plain text of the APA, what matters is whether a law protects natural resources, not the motive behind the protection. [*See* Adv. Dkt. 39-2, APPX000082]. And here, whether focused on the economic recovery of natural resources or not, Chapter 85 is clearly aimed at protecting natural resources by prohibiting the waste and loss of oil and gas in place.

**Second**, even if legislative intent did matter (which it does not), Select offers no legal authority for the proposition that "Chapter 85 is about economics, not the environment." [Adv. Dkt. 40, p. 13]. At best, Select offers limited legal authority for the proposition that economics was a non-exclusive motivating factor for the protection of oil and gas. *Compare Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014) ("The policy of Texas is to encourage the recovery of minerals, and the Legislature has made waste in the production of oil and gas unlawful.") *with In re Am. Coastal Energy*, 399 B.R. 805, 813 (S.D. Tex. Bank. 2009) ("The applicable provisions of the Texas Natural Resources Code are reasonably designed to protect the public health and safety."); TEX. NAT. RES. CODE ANN. § 89.001 ("It is also declared that the protection of water and land of the state against pollution or the escape of oil or gas is in the public interest.").

Further, the fact that oil and gas have economic value is part of what makes them a natural resource. *Natural Resource*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "Natural

Resource" as "[a]ny material from nature having potential *economic* value") (emphasis added). And, Select does not dispute, nor can it reasonably do so, that the Texas Natural Resources Code protects oil and gas.  [Adv. Dkt. 40, p. 13];  *see* TEX. NAT. RES. CODE ANN. §§ 85.045, 85.046, 85.201 (defining Texas Railroad Commission rulemaking authority to further "conservation of oil and gas and prevention of waste of oil and gas").

Select also offers a red-herring argument concerning PPC's insurance litigation.  [Adv. Dkt. 40, pp. 13–14].  However, whether PPC's oil and gas reserves were destroyed by "pollution"—as that term is defined in the applicable insurance policies—has no bearing on whether the Texas Natural Resources Code protects natural resources (including oil and gas) by prohibiting operators from engaging in actions that would make oil and gas reserves unrecoverable by "drowning" a productive stratum.  Nothing in the APA requires PPC's loss to be caused by pollution or environmental contamination in order for the Final Judgment to constitute a liability arising under "Environmental Law," as broadly defined by the APA.

Finally, because the plain text matters, it is worth noting the APA's definition of "Environmental Law" references "any Applicable Law" that relates to the environment, including the subsurface strata.  There can be no legitimate dispute that Chapter 85 of the Texas Natural Resources Code protects the underground environment (*i.e.*, the subsurface strata from which oil and gas is produced) insofar as Chapter 85 expressly prohibits the drowning with water of productive subsurface strata.  Select's arguments that the Final Judgment is not a "Liability" arising under "Environmental Law" should be soundly rejected.

### D.     The Final Judgment is itself an "Environmental Law."

The definition of "Applicable Law" includes any "judgment adopted or promulgated by a Governmental Authority."   [*See* Adv. Dkt. 39-2, APPX000078].   "Governmental Authority" includes any "state . . . court."  [*Id*. at APPX000083].  And, the definition of "Environmental Law"

includes "any Applicable Law . . . relating to . . . the environment (including ambient air, soil, surface water or groundwater, *or subsurface strata*)." [*Id*. at APPX000082]. Because the Final Judgment arises out of Basic's unlawful drowning with water a subsurface strata from which oil and gas was capable of being produced in paying quantities, the Final Judgment *itself* is also an Environmental Law per the plain meaning of the APA. *See* TEX. NAT. RES. CODE ANN. §§ 85.045 (prohibiting waste), 85.046 (defining "waste" as "drowning with water a stratum or part of a stratum that is capable of producing oil or gas or both in paying quantities").

> **E.    The Final Judgment is a "Liability" arising with respect to "Environmental Claims" related to the injection of produced water.**

The APA defines "Assumed Liabilities" to include "Liabilities . . . with respect to Environmental Claims, whether arising on, before or after the Closing Date, *including without limitation those related to the disposing of or discharge of . . . produced water* . . . ." [Adv. Dkt. 39-2, at APPX000079 (emphasis added)]. In turn, "Environmental Claims" is defined to include "any affirmative obligation to resolve noncompliance with, any Environmental Law and any Liability associated with or arising therefrom." [*Id*.].[3]

The Final Judgment undeniably arises from an affirmative obligation to resolve Basic's non-compliance with respect to the injection of produced saltwater by the Orla Kessler disposal well. Indeed, the entirety of PPC's claims were not only concerned with, but sought to hold Basic

---

[3] Basic, as Debtor, had every incentive to shield the Estate from liabilities arising from "Environmental Claims." *See Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 502 (1986) (noting that the court was not "reaching the question of whether certain state laws imposing conditions on abandonment may be so onerous as to interfere with the bankruptcy adjudication itself."); *see also In re Am. Coastal Energy*, 399 B.R. at 814 ("The Court also notes that the Supreme Court has left open the possibility that environmental liabilities may be so significant in relation to the debtor's ability to pay that characterizing all or a portion of an environmental claim as an administrative expense may unduly interfere with the bankruptcy adjudication itself.").

responsible for, its non-compliance with Texas law prohibiting waste and the drowning with water of PPC's reserves.

## II.     THE DISCLOSURE SCHEDULES TO THE APA DO NOT EXPRESS AN OBJECTIVE INTENT BY THE CONTRACTING PARTIES TO SHIELD SELECT FROM ASSUMING LIABILITY FOR THE FINAL JUDGMENT.

When a contract's meaning is undisputed, a court's primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument.  *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018).  "Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not."  *Id.* at 763–64.  Courts applying Texas law "therefore presume parties intend what the words of their contract say, and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise."  *Id.*

The APA and Assumption Agreement plainly state that Select assumes "***all*** Liabilities associated with the Assets arising under Environmental Law":

"<u>Assumed Liabilities</u>" means:

> (a)     all Liabilities under or associated with or appurtenant to the Assets to the extent related to periods from and after the Closing Date (other than Property Expenses for which the Purchase Price is increased pursuant to <u>Section 2.04(a)</u>), including without limitation all such Liabilities arising out of the operation and/or ownership of the Assets from and after the Closing Date;

> (b)     all Customer Lienable Prepetition Accounts Payable;

> (c)     all Assumed Postpetition Accounts Payable;

> (d)     all asset retirement obligations related to the Assets;

> (e)     all Liabilities associated with the Assets arising under Environmental Law, including with respect to Environmental Claims whether arising on, before or after the Closing Date, including without limitation those related to the control, storage, handling, transporting and disposing of or discharge of all materials, substances and wastes from the Assets, including produced water, hydrogen sulfide gas, drilling fluids, NORM and other wastes (but, for the avoidance of doubt, excluding any fines or penalties arising under or related to any such matters attaching to the Sellers as the owners or operators of the Assets prior to the Closing);

[Adv. Dkt. 39-2, APPX000079 (emphasis added)].  Select asks this Court to change the language of the APA and Assumption Agreements from "all Liabilities . . . arising under Environmental Law" to "all Liabilities . . . disclosed on Schedule 3.07."  [*See* Adv. Dkt. 40, pp. 14–15].  Select's argument is directly contrary to the expressed, objective intent of the parties (*i.e.*, what the parties actually said in the agreements), which is that Select assumed "all" Liabilities arising under "Environmental Law"—not just the environmental matters listed in Schedule 3.07.

Schedule 3.07 does not define the scope of liability that Select agreed to assume relating to environmental matters.  Nor does Schedule 3.07, or any other provision of the APA, evidence an objective intent by the parties to use the schedules to classify liabilities as environmental or not, whether at the time of execution or on a go-forward basis.  Rather, the scope of Select's assumed liability for things such as underground loss and waste caused by Basic's injection of produced water is defined solely through the text of the definitions in the APA, including "Liabilities," "Applicable Law," and of course, "Environmental Law" and "Environmental Claims."

Instead of limiting the scope of liabilities assumed by Select, Schedule 3.07 simply contains Basic's representation and warranty concerning what environmental matters Basic knew existed at the time the APA was executed.  Select attempts to recast Basic's representation and warranty—which was limited per the terms of the APA—into a provision that would restrict the scope of "Assumed Liabilities" to the environmental matters in Schedule 3.07 despite no accompanying text or provision to evidence such an intent.  Had Select wished to define "Assumed Liabilities" to mean only those environmental matters disclosed in Schedule 3.07 *and no others*, it could have.  However, it did not.[4]

Select's contention that the parties intended to use the schedules to limit the scope of or otherwise classify environmental liabilities assumed by Select is not reflected in the language of the APA, directly conflicts with the scope of the APA's definitions of "Assumed Liabilities" and "Environmental Law," and is not supported by any admissible evidence in the summary-judgment record.  Moreover, Select's request for a rewrite of the APA is particularly egregious given that Select admits it "indisputably knew about the Reeves County Case at the time of the Sale Transaction," warranted that it had "such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Assets," and was in fact a sophisticated purchaser represented by a sophisticated law firm.  [Adv. Dkt. 40, p. 15 (knowledge); Adv. Dkt. 39-2, APPX000037 (warranty)].

---

[4] For example, in one of the Assumption Agreements with Basic, the parties expressly included text that the buyer would assume all of the liabilities required to be assumed by the buyer under Section 7.05 of the APA. *See* Appendix to Defendant's Motion for Partial Summary Judgment [Adv. Dkt. 40-1, at 472].  Tellingly, the parties did not follow this approach with respect to Schedule 3.07 of the APA in the Assumption Agreement between Select and Basic. [Adv. Dkt. 39-4, at APPX000188].

Additionally, Select's new estoppel argument does not save it from the liabilities it agreed to assume. [*See* Adv. Dkt. 40, p. 15]. The APA is clear that the "representations and warranties of Seller . . . terminate upon and [do] not survive the Closing":

## ARTICLE X
## SURVIVAL AND INDEMNIFICATION

Section 10.01  *Survival.*

(a)    The representations and warranties of Sellers contained herein and in any certificate or other writing delivered by Sellers pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability (whether arising in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which any entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims)) thereafter in respect thereof. Each

[Adv. Dkt. 39-2, APPX000067].

Because Basic's representations and warranties terminated upon closing, and did not survive closing, estoppel does not apply. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005). Indeed, Select's reliance on *Kellogg* is demonstrably misplaced insofar as in *Kellogg*, a non-signatory to a contract sought the benefits of the contract while avoiding the burdens of the contract. *Id.* at 739. Here, however, the APA expressly states that any burdens concerning the representations and warranties of Basic terminated upon closing and did not survive. [Adv. Dkt. 39-2, at APPX000067]. Further, Select has not moved for summary judgment on its affirmative defense of estoppel. And, the fact that Basic's representations and warranties, including those in Section 3.07 of the APA, did not survive closing is incompatible with Select's new contention that the parties must have intended to use the information in the disclosure schedules to classify liabilities into one bucket or another after closing the sale—even though the APA and Assumption Agreement contain no language to that effect. Basic had no practical reason to represent and warrant that the information on the disclosure schedules was true and correct if,

as Select argues, Select's liability was truly limited to only what was actually disclosed. In any event, the disclosure schedules do not change the words and text the parties actually used to define the scope of liabilities assumed by Select under the APA and Assumption Agreement, and PPC is not estopped from seeking to hold Select liable for paying and discharging the Final Judgment per the terms of the agreement Select had a hand in drafting.

### III.     PLAINTIFFS' ACTIONS BEFORE AND AFTER ENTRY OF THE LIFT STAY ORDER ARE CONSISTENT WITH SELECT'S AGREEMENT UNDER THE APA TO ASSUME LIABILITY FOR THE FINAL JUDGMENT.

PPC's actions in the Basic bankruptcy and the Reeves County case are consistent with a finding that the Final Judgment is an "Assumed Liability." Select's allegations of inconsistent conduct on the part of PPC are without merit.

*First*, it is axiomatic that multiple parties can be liable for the same debt. *See, e.g.*, *CL III Funding Holding Co., LLC v. Steelhead Midstream Partners, LLC*, 655 S.W.3d 844, 854 (Tex. App.—Fort Worth 2022, no pet.); *In re Moose Oil & Gas Co.*, 347 B.R. 868, 871 (Bankr. S.D. Tex. 2006). General liability insurance policies indemnify the insured for sums that the insured becomes legally obligated to pay. *See, e.g.*, *Lumar Marine, Inc. v. Ins. Co. of N. Am.*, 910 F.2d 1267 (5th Cir. 1990). That is, insurance indemnifies for, but does not remove, the liability of the insured and its successors-in-interest. *See In re Essex Ins. Co.*, 450 S.W.3d 524, 525 (Tex. 2014) ("In Texas, the general rule . . . is that an injured party cannot sue the tortfeasor's insurer directly until the tortfeasor's liability has been finally determined by agreement or judgment."). PPC's position that Select assumed liability to pay the Final Judgment (which Select contests) as set forth in the text of the APA is consistent with PPC's position that Basic's insurance policies also provide coverage for PPC's loss (which Basic's insurers contest) under the specific language utilized in those policies. While PPC is seeking to satisfy the liability evidenced by the Final Judgment from multiple parties, it is not true that PPC is taking inconsistent legal and factual positions in one

proceeding over the other. Instead, PPC has sought simply to enforce the plain text of the various agreements and insurance policies that provide indemnity for PPC's substantial loss.

*Second*, the Court's previous orders did not limit PPC's recovery of the Final Judgment to only proceeds from Basic's insurers. Rather, this Court has consistently recognized PPC's right to collect the Final Judgment against any of Basic's insurers, as well as any other third party who may be liable for the same (such as Select under the APA and Assumption Agreement). For example, while paragraph 4 of the Lift Stay Order allows PPC to collect any settlement or judgment from insurers providing coverage for PPC claims, it does not limit PPC's collection to only insurers. Instead, the order clearly articulates PPC was free to pursue collection under applicable insurance policies and *from other third parties*, provided that collection did not come from either Basic or its bankruptcy estate. [Main Dkt. 497, ¶ 4 ("The Movants' collection pursuant to a final judgment is recoverable only from the applicable insurance policies of the Debtors *and other third parties* and not from the Debtors or their estates directly or indirectly.") (emphasis added)].

Select's argument that the Lift Stay Order's reference to "other third parties" must mean "other third parties' insurance policies" makes no sense. [Adv. Dkt. 40, at 17 n.12]. PPC did not need to lift the automatic stay in order to pursue any claims against other third parties. Further, in order to even pursue insurance proceeds from a third party like Select, PPC would first be required under the Texas' direct-action rule to sue and obtain a judgment against the third party as a condition to seeking collection from the third party's insurer. *See Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009).

And, even if there was any dispute concerning the scope of the Lift Stay Order, the Court reiterated in April 2023 that the Lift Stay Order permits collection of the Final Judgment against all contractually-liable third parties—not just insurance companies:

> The disallowance and expungement of Proof of Claim No. 1272 filed by PPC Energy, L.P. and Priest Petroleum Corporation shall not prejudice, impair, or otherwise operate as an estoppel or bar to PPC Energy, L.P. and Priest Petroleum Corporation's rights under the Stipulation and Order Granting Limited Relief from the Automatic Stay Regarding PPC Energy, LP and Priest Petroleum Corporation Litigation (the "Stipulation") [Docket No. 336] to (a) prosecute the case pending as *PPC Energy, LP and Priest Petroleum Corporation v. NGL Water Solutions Permian, LLC, et al.*, Cause No. 20-01-23355-CVR in the 143rd Judicial District Court in Reeves County, Texas (the "Lawsuit") to final judgment; (b) collect upon such settlement or final judgment (i) from any and all insurance carriers providing coverage for the claims asserted in the Lawsuit; and/or (ii) by funds available under any and all insurance policies providing coverage for the Debtors' adjudicated liability; and/or (iii) from any other insurance obligations of the Debtors' insurance carriers in connection with or related to claims asserted by or against the Debtors; and/or (iv) *from any other parties other than the Debtors or their insurance carriers who may be obligated (by contract or otherwise) to satisfy liabilities or obligations associated with the Orla Kessler #1 disposal well*.

[Main Dkt. 1698, ¶ 3 (emphasis added)].  Given that the Court has already expressly recognized PPC's right to collect the Final Judgment against "parties other than the Debtors or their insurance carriers," Select's position that the Lift Stay Order only applies to insurance proceeds is untenable.

*Third*, Select's contention that PPC should have sued Select directly—instead of establishing liability against Basic to trigger Select's duty to pay—contradicts both the plain language of the APA and Select's prior argument advanced in its motion to dismiss.

The Assumption Agreement is clear—Select assumed the obligation to "pay, perform, observe the terms of, satisfy and/or discharge if, as, when and to the extent due in accordance with the terms thereof, the . . . liabilities and obligations of Sellers":

2.      Assumption.   Select hereby undertakes, assumes, covenants to pay, perform, observe the terms of, satisfy and/or discharge if, as, when and to the extent due in accordance with the terms thereof, the following liabilities and obligations of Sellers (individually an "Assumed Liability" and collectively, the "Assumed Liabilities"):

[Adv. Dkt. 39-3, APPX000187].   In other words, Basic retained independent liability for PPC's claims despite Select's agreement to undertake and assume Basic's liability as its own.  *See CL III Funding Holding,* 655 S.W.3d at 854; *Matter of Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt.  Section 524(e) specifies that the debt still exists and can be collected from any other entity that might be liable.").

And, as mentioned, PPC was required to establish liability owed by Basic in order to trigger Select's obligation to pay.  *Edgeworth*, 993 F.2d at 53 (recognizing contract may require plaintiff to "first establish the liability of debtor before" another party "becomes contractually obligated to make any payment.").   Select's previous briefing, which Select now seeks to abandon, admits that PPC's adjudication against Basic was necessary to trigger Select's obligation to pay:

6    The automatic stay remains in effect, except to the extent modified by the Lift-Stay Order, because the chapter 11 cases have not been closed or dismissed and, although the Debtors confirmed a plan, it was a liquidating plan without a discharge.  *See* 11 U.S.C. § 362(c)(2); *see also Order Confirming the Debtors' Combined Plan of Liquidation and Approving on a Final Basis the Disclosure Statement of Basic Energy Services, Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. 1436], p. 13 ¶ 28.

And:

Each Assumption Agreement unambiguously provides that Select (or the applicable affiliate) "undertakes, assumes, covenants to pay, perform, observe the terms of, satisfy and/or discharge *if, as, when and to the extent due* in accordance with the terms thereof, *the following liabilities and obligations of Sellers* [*i.e.*, the Assumed Liabilities] . . . ." *See* App. pp. 115, 123, 128, 134 [Assumption Agreements, § 2 (emphasis added)]; *see also* App. p. 81 [APA, p. A-2 (definition of "*Assumed Liabilities*")]. Thus, under the APA and Assumption Agreements, Select could – at most – be responsible to pay a liability of Basic "if, as, when and to the extent" it is "due" from Basic.

Although Plaintiffs failed to disclose it in their Petition, Basic *appealed* the Negligence Judgment on August 9, 2023, approximately two weeks before Plaintiffs filed this case against Select. *See* App. Ex. E (Notice of Appeal). As a result of the Notice of Appeal, the Negligence Judgment is *not* due from Basic.[5] Indeed, if Basic prevails on appeal, the Negligence Judgment will *never* be due from Basic. And because Select only agreed to pay Assumed Liabilities "if, as, when and to the extent due" from Basic, Select has not breached any obligation to pay the Negligence Judgment, and is not responsible to pay the Negligence Judgment. Plaintiffs' breach of contract and declaratory relief claims thus fail as a matter of law and must be dismissed.

[Adv. Dkt. 5-1, pp. 4–5].

Select's own briefing admits that a finding of liability against Basic (*i.e.*, the Final Judgment) was a necessary condition to trigger Select's obligation to pay and satisfy the Final Judgment as an "Assumed Liability" not only under the Assumption Agreement, but also the Sale Order. Therefore, PPC was required to seek the entry of the Lift Stay Order, even after the entry of the Sale Order and the execution of the Assumption Agreement, in order to adjudicate Basic's liability to avoid violating the automatic stay under Section 362 of the Bankruptcy Code. Nothing

in the Sale Order or the Assumption Agreement released Basic for "Liabilities" associated with the Assets, including those that Select agreed to take on as "Assumed Liabilities." *Cf. In re Applewood Chair Co.*, 203 F.3d 914, 919 (5th Cir. 2000) (sale order discharged only those claims expressly addressed in order).

**Fourth**, there are no inconsistencies between PPC's position in this case and PPC's position in the ongoing insurance case. Select alleges inconsistencies insofar as PPC contends in the insurance case that: (a) the Final Judgment demonstrates Basic committed negligence; and (b) the Final Judgment was not caused by pollution as that term is defined in the Underwriters' insurance policy. [Adv. Dkt. 40, pp. 17–18]. But no daylight exists between PPC's positions in this case and PPC's positions in the insurance case. Rather, PPC has always maintained Basic committed negligence and negligence per se. *Zamora v. Wells Fargo Bank, N.A.*, No. H-19-3966, 2020 WL 4708153, at *3 (S.D. Tex. Aug. 13, 2020) (identifying negligence per se as "a particular type of negligence where the relevant standard of care is set by statute"). Likewise, PPC has never taken the position that PPC's harm was caused by pollution as that term is used in the Aspen policies. In any event, neither the APA nor the Assumption Agreement require any showing that PPC's damage was caused by pollution in order to trigger Select's liability for the Final Judgment.

## IV.       SELECT IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT.

Select's request for partial summary judgment is predicated on the theory that the Final Judgment is not an Assumed Liability. However, because the Final Judgment is an Assumed Liability per the unambiguous terms of the APA and the Assumption Agreement, the Court should deny Select's request for partial summary judgment. Moreover, because the Final Judgment is an Assumed Liability as a matter of law, the Court should use its discretion under Rule 56(f) to grant partial summary judgment, against Select, and in favor of PPC on: (a) Select's counterclaim for declaratory relief (Declaration No. 1 and Declaration No. 3); (b) PPC's third cause of action for

breach of contract; and (c) PPC's fourth cause of action for declaratory relief (Declaration No. 1 and Declaration No. 2). In the alternative, the Court should permissibly abstain from deciding any issue in this case, including whether the Final Judgment is an Assumed Liability under the APA.

## **CONCLUSION AND PRAYER**

WHEREFORE, PREMISES CONSIDERED, PPC respectfully requests that the Court: (a) deny Defendant's Motion for Partial Summary Judgment; (b) grant PPC summary judgment on Select's counterclaim for declaratory relief, on PPC's third cause of action for breach of contract, and on PPC's fourth cause of action for declaratory relief; and (c) remand the remaining issues to Harris County District Court and/or permissively abstain from the remaining issues. In the alternative, PPC asks that the Court permissively abstain from deciding any issues in this case and remand the case to Harris County District Court. In either event, PPC asks that the Court award PPC all such other and further relief, whether general or special, at law or in equity, to which PPC may show itself to be justly entitled.

Respectfully submitted,

_Michael Reer_

Jeff P. Prostok
State Bar No. 16352500
jprostok@forsheyprostok.com
Deirdre Carey Brown
State Bar No. 24049116
dbrown@forsheyprostok.com
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151

Michael K. Reer
Attorney-in-charge
S.D. Tex. ID. 3272174
State Bar No. 24088281
mreer@hfblaw.com
**HARRIS, FINLEY & BOGLE, P.C.**
777 Main Street, Suite 1800
Fort Worth, Texas 76102
Telephone No.: (817) 870-8700
Facsimile No.: (817) 332-6121

**ATTORNEYS FOR PLAINTIFFS
PPC ENERGY, LP AND PRIEST
PETROLEUM CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Brief was served via CM-ECF to all attorneys registered to receive ECF notice in this case on December 22, 2023 and that a courtesy copy was e-mailed to Defendant's counsel Jordan Leu.

_Michael Reer_

Michael K. Reer